660 F.2d 532
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Anthony DeSIMONE, III, George Robert Thomson, George
Christopher Broderick, Phillip Eugene Miner, David Hampton
Butler, Warren Waldon, a/k/a Warren Cook, John Robert
Howard, a/k/a John Hamilton, Roy Barron Elder and William
Robert Ralston, Defendants-Appellants.
 No. 79-5675.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 2, 1981.
 Steven W. Ludwick, Atlanta, Ga., for DeSimone.
 Alvin E. Entin, North Miami Beach, Fla., for Thomson, Broderick, Howard, Elder, Ralston and Waldon.
 Sheldon "Skip" Taylor, Miami, Fla. (Court-appointed), for Butler and Miner.
 W. A. Kimbrough, Jr., U. S. Atty., William R. Favre, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before GODBOLD, Chief Judge, and MORGAN and HENDERSON, Circuit Judges.
 HENDERSON, Circuit Judge:
 
 
 1
 This case originated with the indictment of sixteen defendants, all of whom were charged in four counts with distribution and possession with intent to distribute marijuana, 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2; conspiracy to distribute and to possess with intent to distribute marijuana, 21 U.S.C.A. § 846, importation of marijuana, 21 U.S.C.A. § 952(a); and conspiracy to import marijuana, 21 U.S.C.A. § 963. The trial commenced on October 17, 1979 in the United States District Court for the Southern District of Alabama with all defendants present except H. B. Sandini, who failed to appear, and Frank Kostof and William Joseph Wolff, both of whom died before trial. At the conclusion of the government's case, the trial court granted judgments of acquittal in favor of William Thomas Craig and Charles Alsup Baughman and dismissed the first count of the indictment as to all defendants. At the end of the trial, the jury returned guilty verdicts against all defendants except Allen Ervin Singleton, who was acquitted of all charges, and George Robert Thomson, who was found not guilty on Count Four. Each defendant was sentenced consecutively to a five-year prison term, $15,000.00 fine, and ten-year special parole term on each count. This appeal followed. We affirm in part and reverse in part.
 
 
 2
 The evidence, taken in its light most favorable to the government, establishes that on June 7, 1979, several of the original sixteen defendants arrived at the Quality Inn Motel in Tuscaloosa, Alabama. Sandini, the apparent leader of the group, paid cash for all of the rooms rented and registered them in the name of Atlas Land Development Company. He and his driver, Craig, checked into adjoining rooms numbers 115 and 117, while the other defendants in the entourage were located throughout the motel. Sandini placed several telephone calls from his room to the Island of Aruba and to a number in Florida. These circumstances aroused the suspicions of Mrs. Stevenson, the motel manager. She contacted the Tuscaloosa Police Department, which in turn undertook surveillance of the defendants. From the facts thereafter observed or uncovered, a sequence of events emerged.
 
 
 3
 On June 5, 1979, the defendant Roy Barron Elder rented two Hertz eighteen-foot stake bed trucks in Birmingham, Alabama. Several days later, Baughman purchased over 900 gallons of fuel and filled the tank of one of the Hertz trucks. On June 9, 1979, Singleton rented an eight-wheel trailer in Mobile, Alabama. He hauled the trailer to Tuscaloosa the following day and checked into the Holiday Inn across the street from the Quality Inn. On the same day, June 10, 1979, Elder purchased a Honda generator presumably to be used in conjunction with a barrel pump for transferring fuel into an airplane. The next day, the defendant George Christopher Broderick rented a van, six skate conveyors, three ladders and a barrel pump. The defendant James Joseph Iouna was seen driving the van later that evening. Also on that date, Elder and the defendant David Hampton Butler rented automobiles in Tuscaloosa, Butler leasing a yellow Caprice and Elder a red Caprice. During this relevant time period, the officers conducting the surveillance observed all of the defendants within the area of the Quality Inn with the exception of Wolff, Kostof and Phillip Eugene Miner.
 
 
 4
 On the evening of June 11, 1979, Broderick, Elder, John Robert Howard, William Robert Ralston, Thomson, Craig and Warren Waldon, a/k/a Warren Cook, met in front of Sandini's room and then went to dinner. Later that evening, Sandini walked to his Lincoln Continental automobile, removed a bottle of liquor, and handed it to Iouna, who had driven up in the van containing the ladders and skate conveyors. Sandini also distributed flashlights to Iouna, Ralston and Waldon. Singleton moved his tractor-trailer rig to another location and was later observed leaving Sandini's room with Ralston. The two men then opened the rear doors of the trailer and unidentified persons loaded the ladders and skate conveyors onto it. Baughman, who was standing next to the van, was joined by Thomson and both of them changed into working clothes. Shortly thereafter, Sandini, Craig, Butler, Iouna, Waldon and Broderick congregated in front of rooms 115 and 117. The watching officers noted that everyone except Sandini left the motel, but they were unable to determine which individuals departed in each of the various vehicles.
 
 
 5
 By this time, around midnight, the Customs Service had been informed of these activities and dispatched an airplane which followed Singleton's tractor-trailer rig to a small airport near Greensboro, Alabama. At 3:30 a. m., the Customs crew and several officers on the ground saw a DC-6 aircraft land on the airstrip. The Custom's plane landed and nosed up to the DC-6, which had by that time turned around, to prevent it from taking off. The crew observed the tractor-trailer and one of the fuel trucks pulling away from the DC-6. The other fuel truck was abandoned nearby.
 
 
 6
 Police officers approaching the airport stopped the tractor-trailer as it was leaving the area, arrested Singleton, and observed ladders, skate conveyors, a flashlight and a ground-to-air radio in the trailer. Within a few minutes of this arrest, the fuel truck emerged from the airport area. An officer fired a warning shot and the truck stopped. Howard, the driver, Broderick, Miner, Ralston and Wolff were arrested. Shortly thereafter, the red Caprice drove into a ditch as it was traveling away from the airport on the same road. Elder, Kostof, Thomson and the defendant Robert Anthony DeSimone were apprehended in the vicinity of that automobile. Iouna was arrested a few miles from the airport in the yellow Caprice. Large quantities of marijuana were discovered in the DC-6.
 
 
 7
 Later in the day of June 12, 1979, Butler and Waldon were apprehended at the Uniontown, Alabama bus station, several miles from the Greensboro airport. Baughman was found hitchhiking in the Greensboro area. Sandini and Craig were arrested as they drove away from Tuscaloosa.
 
 
 8
 A search of Sandini's Lincoln Continental revealed walkie-talkies, strobe lights, aeronautical charts and maps, aircraft gauges, a flashlight and items of identification. Receipts from the Holiday Inn Motel on Aruba indicated that Kostof, Miner and Wolff stayed there on the night of June 10, 1979.
 
 
 9
 In searching the DC-6, officers found a suitcase belonging to Miner and numerous items bearing the fingerprints of Kostof, Wolff and Miner. Flight documents covering locations in Colombia, Aruba, Florida and Alabama were discovered. A map of South America located in the cockpit of the plane bore Butler's fingerprint. Elder's prints appeared on the van, and a fingerprint belonging to DeSimone was found on the trunk of the yellow Caprice. Finally, Waldon's prints were found on an out-dated flight plan situated in the cockpit of the DC-6 and on a piece of paper inside a suitcase located in the rear of the red Caprice.
 
 
 10
 Of the original defendants, only Ralston, DeSimone, Thomson, Broderick, Howard, Miner, Butler and Waldon are appellants in this case.[1] They assign numerous purported errors on appeal, some of which are of common interest and others which have more limited application. We concentrate our attention on those issues which we believe are of major and controlling significance.
 
 Sufficiency of the Evidence
 
 11
 Although all appellants timely moved for judgments of acquittal at the trial, only DeSimone and Waldon directly challenge the sufficiency of the evidence on appeal. Our task is to read the record in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and, from there, determine whether the jury's verdict is supported by substantial evidence, United States v. Malatesta, 590 F.2d 1379 (5th Cir.) (en banc), cert. denied, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). To uphold the convictions on the conspiracy counts, we must be satisfied that the government proved beyond a reasonable doubt that these appellants had "the deliberate, knowing, specific intent to join the conspiracy." United States v. Morado, 454 F.2d 167, 175 (5th Cir.), cert. denied, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). "It is not enough for it merely to establish a climate of activity that reeks of something foul." United States v. Wieschenberg, 604 F.2d 326, 331-32 (5th Cir. 1979).
 
 
 12
 The government's evidence against DeSimone no doubt places him in a suspect "climate of activity." He checked into the Quality Inn in Tuscaloosa on June 7, 1979 and, we can assume, occupied one of the rooms registered to the nonexistent Atlas Land Development Company. He was observed in the presence of several other defendants on the afternoon of June 11, 1979. Finally, he was apprehended in the early morning hours of June 12, 1979 in the vicinity of the red Caprice, presumably having fled from that vehicle along with three other defendants.[2]
 
 
 13
 DeSimone maintains that, at most, this evidence establishes that he was hired or was otherwise on hand to aid in the unloading of the aircraft. Perhaps this assertion may admit too much. The government did, of course, prove his association with certain other defendants, his presence near the landing site of a marijuana-laden airplane and his attempted flight.
 
 
 14
 We have consistently held that mere association with persons involved in a criminal enterprise is insufficient to prove participation in a conspiracy. See, e. g., United States v. Horton, 646 F.2d 181, 185 (5th Cir., 1981); United States v. Fitzharris, 633 F.2d 416, 423 (5th Cir. 1980); United States v. Barrera, 547 F.2d 1250, 1257 (5th Cir. 1977). We have just as strongly emphasized that mere presence at the scene of the crime is not enough to sustain a conspiracy conviction. See, e. g., United States v. Reyes, 595 F.2d 275, 280 (5th Cir. 1979); Barrera, supra, at 1256. Presence followed by flight is also inadequate proof. United States v. Lopez-Ortiz, 492 F.2d 109, 115 (5th Cir. 1974).[3] In this case, we are confronted with the combined circumstances of DeSimone's association with his co-defendants at various times over a period of several days and his attempted flight in the middle of the night from an automobile which was ditched near the Greensboro airport, a remote area. This evidence certainly arouses suspicion, but does it prove beyond a reasonable doubt that DeSimone conspired to import and distribute marijuana? We think not.
 
 
 15
 Obviously, appellant's presence was highly suspicious, but this is not a substitute for evidence sufficient to prove beyond a reasonable doubt. Although it is certainly possible maybe even probable that (the appellant) was involved in the conspiracy, such speculation does not constitute proof beyond a reasonable doubt, and juries "must not be permitted to convict on suspicion and innuendo."
 
 
 16
 United States v. Rozen, 600 F.2d 494, 497 (5th Cir. 1979), quoting United States v. Littrell, 574 F.2d 828, 833 (5th Cir. 1978). Although it was unnecessary for the government to prove any overt act on the part of DeSimone in furtherance of the drug conspiracy, it did have to establish, either by direct or circumstantial evidence, that he actually entered into an agreement with the purpose of achieving the unlawful objectives of importing, possessing and distributing marijuana. See United States v. Cardona, 650 F.2d 54, 56 (5th Cir., 1981); Littrell, supra, at 832. We believe the government's proof is lacking in this respect.[4] And if the evidence fails to demonstrate DeSimone's participation in the conspiracy, it is patently insufficient to sustain his conviction of the substantive importation count. Hence, his conviction must be reversed.
 
 
 17
 The case against Waldon is more convincing. The record reveals that he was among the group observed in the area of rooms 115 and 117 of the Quality Inn on June 11, 1979. On that evening, he went to dinner with several of the co-defendants. Later that night, shortly before the mass departure from the Quality Inn, he was seen receiving a flashlight from Sandini. He then drove the red Caprice to an area in front of room 117. The next day, he was apprehended along with appellant Butler at the Uniontown bus station.
 
 
 18
 Waldon's fingerprint was found on an international flight map which was located in the cockpit of the DC-6. This map was out-dated and, according to a Customs Service pilot who testified for the government, had nothing to do with the flight route taken by the DC-6 in this case.[5] A fingerprint belonging to Waldon also appeared on a pad of paper found inside a suitcase which was taken from the rear of the red Caprice.[6]
 
 
 19
 In recounting its evidence against this appellant, the government adds that Waldon was with Butler when the yellow Caprice was rented. This assertion is derived from the testimony of John Freeman, the Dixie Air employee who handled the lease transaction involving this automobile, which was elicited outside the presence of the jury. Even though Butler's name appeared on the rental receipt, Freeman identified Waldon rather than Butler as the lessee of the automobile. Since Waldon and Butler vary drastically in physical appearance, Waldon being some seven inches taller and 225 pounds heavier, we may assume that this is no ordinary case of misidentification; rather, it appears likely that Waldon accompanied Butler to the rental office and that Freeman was simply mistaken as to which of the two signed the receipt.
 
 
 20
 Although we are led to this assumption from our reading of the record, the jury could not have reached a similar conclusion. Due to ensuing illness, Freeman was unavailable as a witness during the remainder of the trial. The jury never heard his testimony or learned of the circumstances surrounding his identification of Waldon. Rather, a stipulation subsequently read to the jurors merely stated that Freeman did not identify Butler. In short, Waldon's possible involvement in the leasing of the yellow Caprice cannot enter into our analysis of the sufficiency of the evidence against him.
 
 
 21
 Disregarding the events surrounding the automobile lease, there is still the evidence of Waldon's association with several of his co-defendants, his receipt of a flashlight from Sandini, his driving the red Caprice at the motel, and the fingerprints found in the aircraft and the suitcase. The culmination of all these facts clearly point to his participation in the plan and occurrences of early June, 1979. Unlike DeSimone, he was not apprehended or seen in the vicinity of the landing site, but we believe that the totality of other circumstances provide a sufficient evidentiary basis to sustain the jury's finding of Waldon's guilt beyond a reasonable doubt.
 
 Severance
 
 22
 Motions for severance were made continuously throughout the trial, with each appellant so moving on one or more occasions for one or more reasons. None of these motions was granted, and all appellants except Waldon raise the severance issue on appeal. In evaluating the various contentions, we are mindful that the grant or denial of a motion for severance made pursuant to Rule 14 of the Federal Rules of Criminal Procedure is within the discretion of the trial court and is reversible only for abuse of that discretion. United States v. Martino, 648 F.2d 367, 384 (5th Cir., 1981); United States v. Salomon, 609 F.2d 1172, 1175 (5th Cir. 1980). Such a motion should be granted only if the appellant can demonstrate compelling prejudice which could not be alleviated by the trial court and that he was unable to obtain a fair trial. United States v. Horton, 646 F.2d 181, 186 (5th Cir., 1981); United States v. Crawford, 581 F.2d 489, 491 (5th Cir. 1978).
 
 
 23
 Miner, Broderick, Thomson, Howard, Ralston and DeSimone sought severance on the ground that they intended to introduce the purportedly exculpatory testimony of co-defendant Butler, who would testify in their behalf only if he were tried separately. In support of this motion, they filed an affidavit signed by Butler which states the following:
 
 
 24
 1. That I, DAVID BUTLER, am a Defendant in the above styled cause.
 
 
 25
 2. That I possess testimonial evidence which is exculpatory in nature to each of the other co-defendants.
 
 
 26
 3. Each of the other co-defendants possess (sic) testimonial evidence which is exculpatory in nature to myself.
 
 
 27
 4. I would testify on behalf of the co-defendants that I did not conspire with them, nor they with myself as charged in the Indictment.
 
 
 28
 5. That I would testify on behalf of the co-defendants that neither I or the co-defendants possessed marijuana in the manner described in the Indictment.
 
 
 29
 6. That the many co-defendants in the instant cause have assured myself and my counsel that they are willing to testify in my behalf that they never saw me in possession of any marijuana as described in the Indictment, and further, that they never conspired with myself as described in the Indictment.
 
 
 30
 7. That each of the co-defendants have (sic) indicated they would not be willing to testify at a joint trial.
 
 
 31
 8. That the testimony sought from the co-defendants in the instant cause by myself is relavant (sic), material, competent and non-cumulative in that the testimony of the co-defendants would clearly establish and corroborate my innocence.
 
 
 32
 With this affidavit, the appellants attempted to satisfy the criteria for severance set out in Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970), and its progeny, see, e. g., Tifford v. Wainwright, 588 F.2d 954 (5th Cir. 1979); Abbott v. Wainwright, 616 F.2d 889 (5th Cir. 1980). This case authority requires the movant to demonstrate 1) a bona fide need for the testimony, 2) the substance of the testimony, 3) its exculpatory nature and effect and 4) that the co-defendant will in fact testify if the cases are severed. United States v. Duzac, 622 F.2d 911, 912 (5th Cir. 1980); United States v. Butler, 611 F.2d 1066, 1071 (5th Cir. 1980). If such a showing is forthcoming, the district court must then 1) examine the significance of the testimony in relation to the defendant's theory of defense, 2) assess the extent of prejudice caused by the absence of the testimony, 3) pay close attention to judicial administration and economy and 4) give weight to the timeliness of the motion. Id.
 
 
 33
 Assessing the appellants' motion in light of these standards, we conclude that the district court did not abuse its discretion in denying the request for severance. In particular, we note that Butler's affidavit contains no clear indication of specific and exonerative facts to which he would testify if severed. Rather, it amounts to little more than a bare, conclusory assertion that he did not conspire with his co-defendants, nor they with him. As a matter of fact, the only person who would tend to be exonerated by this testimony is Butler himself, for nowhere does he indicate that his co-defendants did not conspire with each other.[7] Moreover, because the purportedly exonerating testimony proffered by Butler did not contravene his own penal interests, but instead was extremely self-serving, it lacked a certain amount of credibility. See United States v. Metz, 608 F.2d 147, 156 (5th Cir. 1979). Under these circumstances, we believe that any prejudice occasioned by the absence of Butler's testimony was outweighed by the judicial economy considerations inherent in this complex conspiracy case.[8]
 
 
 34
 Broderick contends that another of his motions for severance should have been granted on the authority of Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), when his trial counsel, Henry Pitts, represented to the district court that a conflict of interest had arisen due to a witness' identification of Broderick rather than Singleton as the lessee of the trailer. We first note that Holloway does not even deal with the subject of severance. Rather, it establishes a rule for the granting of a timely motion for appointment of separate counsel upon a defense attorney's representation that, due to confidential communications with his co-defendant clients, he is aware of an actual or potential conflict of interest. Even assuming Broderick can avail himself of the Holloway rule in arguing the merit of his motion for severance, that opinion recognizes that the trial court is not precluded from exploring the adequacy of defense counsel's representations as long as it does not require the divulgence of confidential matter.
 
 
 35
 In this case, the attorney's knowledge of the purported conflict of interest did not even have a confidential source. The record reflects that the district judge conscientiously inquired into the basis and validity of Pitts' belief that a possible conflict existed. The essence of the concern expressed by Pitts was that he could not press the misidentification issue for Broderick's benefit because he feared that the witness might then point a finger at another of his clients. We agree with the district court's determination that this situation did not produce an appreciable conflict among the interests of the defendants represented by Pitts. This is particularly true since Singleton, who actually rented the vehicle, was not one of Pitts' clients. Further, Broderick was in no way prejudiced by the denial of his motion for severance. Later in the trial, Singleton took the stand and stated affirmatively and unequivocally that he rented the trailer in question and that the identification of Broderick was erroneous.[9]
 
 
 36
 Butler complains that the denial of his motion for severance prevented him from arguing to the jury that Waldon, rather than he, had been identified as the person who rented the yellow Caprice. However, as previously noted, a stipulation was read to the jurors to the effect that Freeman, the Dixie Air employee, did not identify Butler as the person who rented the automobile during his testimony outside the presence of the jury. There was, of course, no mention of Waldon's name. The record discloses that the stipulation device was used at the suggestion and insistence of Butler's counsel, and that all parties affected by this particular identification problem were satisfied with this solution. Since Butler can demonstrate no compelling prejudice, we agree with the district court's determination that severance was not necessary.
 
 
 37
 Ralston has a better argument for severance on the antagonistic defense theory. Of all the defendants, only Singleton took the stand or even asserted any defense whatsoever. Singleton testified that he had been hired by Ralston to haul some furniture, specifically television sets. Since there was a truckers' strike in progress at the times relevant here which was accompanied by a good deal of violence, he did not think it unusual that the furniture would be picked up at the airport warehouse in the middle of the night. Singleton insisted that he did not know illegal activity was afoot until after the arrest. More important for our present purposes, Singleton very carefully avoided throughout his testimony any reference to guilty knowledge on the part of Ralston or any suggestion that Ralston was involved in the overall drug conspiracy. His most damaging statement in this regard came when he stated that upon the landing of the DC-6 (not the Custom's plane), Ralston, who was with Singleton in the cab of the truck, told him to "get out of here."
 
 
 38
 We have no doubt that Ralston's cause was not aided by Singleton's testimony. However, in our opinion, he did not suffer prejudice so compelling that his trial was ultimately unfair. "Severance is allowable when antagonistic defenses are present, but the conflict must reach a point where the defenses are irreconcilable and mutually exclusive." Horton, supra, 646 F.2d 181 at 186 (emphasis added). See also United States v. Mota, 598 F.2d 995, 1001 (5th Cir. 1979). Ralston does not meet this strict standard. Although Singleton testified and Ralston did not, we may presume that their defenses were consistent insofar as each relied on the circumstantial nature of the government's case and the jury's ability to hypothesize the innocence of his involvement. Singleton's testimony did not render the defenses irreconcilable. Consequently, the denial of Ralston's motion for severance was not an abuse of discretion.
 
 
 39
 Several of the appellants claimed the right of severance for other reasons, primarily on the basis of remarks made here and there by co-defendants' counsel. We have examined these incidents and conclude that none of them warranted severance. Although we affirm the district court's rulings on these various motions, we are not totally unsympathetic to, and do not mean to oversimplify, the plight of defendants who find themselves involved in a trial of this magnitude and complexity.
 
 
 40
 We are keenly aware that joint trials, especially those involving numerous defendants and multiple charges, carry substantial risks of manifest unfairness. We do not encourage trials en masse. We must, however, reckon with the realities of this type prosecution. The Constitution does not guarantee a trial free from the burdens that inevitably accompany such a trial; rather, it requires that the potential for transferability of guilt be minimized to the extent possible in order to "individualize each defendant in his relation to the mass."
 
 
 41
 United States v. Martino, supra, 648 F.2d 367 at 385 (citations omitted). We believe this objective was reasonably attained in the instant case.
 
 
 42
 Additional Issues Raised by Appellant Butler
 
 
 43
 Butler alleges several trial errors which, for the most part, concern the validity of his conviction alone. One of his contentions faults the district court for refusing to suppress the contents of a suitcase belonging to him which was found in the trunk of Sandini's car. The particular items which he sought to have suppressed were his driver's license, his Social Security card, and seven credit cards bearing his name.
 
 
 44
 Butler admits that a valid warrant had been issued authorizing the search of the automobile. He argues, though, that a separate warrant should have been obtained prior to the opening and search of his locked suitcase. We disagree. The warrant authorized a search of the automobile for "marijuana, five locked suitcases and five unlocked suitcases." Even though this language may be somewhat ambiguous as to whether the suitcases themselves were containers which were to be opened and searched or were merely among the concealed items to be seized, the direction to search the car for marijuana justified the opening of the suitcases since they could have easily and quite logically contained the suspected contraband. Under these circumstances, an additional warrant was not necessary. Accord, United States v. Kralik, 611 F.2d 343 (10th Cir. 1979) (officers were not required to obtain an additional warrant for the search of a suitcase found in the trunk of an automobile where a warrant had already been obtained authorizing the search of the automobile for a sawed-off shotgun.)[10]
 
 
 45
 Butler also contends that he was arrested in Uniontown without probable cause, and that the fingerprint exemplars obtained from him at that time should have been suppressed in accordance with Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Assuming without deciding that Butler was indeed illegally arrested by state authorities, we are persuaded by the reasoning of the Seventh and Second Courts of Appeal in United States v. Rowell, 612 F.2d 1176, 1179-80 (7th Cir. 1980), and United States v. Jarvis, 560 F.2d 494, 498-99 (2d Cir. 1977), cert. denied, 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978). Subsequent to the Uniontown incident, Butler was arrested under a federal complaint. Additional exemplars were procured at that time which could just have easily been used for comparison purposes. "The allegedly illegal state arrest was thus not a 'but for' cause of the introduction of the fingerprint comparison, and therefore the fingerprint comparison was properly admitted." United States v. Rowell, supra, at 1179. Davis v. Mississippi involved a wholesale round-up of black youths, and Davis' fingerprints were the only evidence linking him to the crime. Despite Butler's assertions to the contrary, his case simply does not fit the Davis mold.[11]
 
 
 46
 Butler's remaining claims are also without merit. The Dixie Air rental agreement bearing his signature was properly admitted into evidence under the business record exception to the hearsay rule. Fed.R.Evid. 803(6). The jury was made aware that Freeman, the Dixie Air employee, was unable to identify Butler. Thus, it was free to consider this information in assessing the weight properly attributable to the rental document.
 
 
 47
 The prosecutor's remarks during closing argument, to the effect that Butler's counsel would have let the jury know if the driver's license number on the car rental agreement did not belong to Butler, were improper and cannot be condoned. Nevertheless, the district judge immediately gave a curative instruction. Moreover, since it cannot be said that the prosecutor's manifest intention was to comment on Butler's failure to testify, or that the remarks were of such a character that the jury would naturally and necessarily take them to be such a comment, reversal is not required. See United States v. Rochan, 563 F.2d 1246, 1249 (5th Cir. 1977).
 
 
 48
 Butler also objected to the testimony of Cooper Henry, the man who gave him a ride to the Uniontown bus station, because Henry had not been disclosed as a witness in compliance with the Omnibus Agreement entered into by the government and the defendants prior to trial. The record reflects that as soon as the prosecutor learned of this witness he so informed the court and defense counsel. Butler was not substantially prejudiced by the testimony because Henry did not even identify him. Under these circumstances, the district court's decision to release the government from the pretrial agreement is not reversible error. See United States v. Jackson, 621 F.2d 216, 220 (5th Cir. 1980); United States v. James, 495 F.2d 434, 436 (5th Cir. 1974).
 
 Remaining Issues
 
 49
 The remaining issues may be disposed of more readily. Ralston and Broderick challenge the admission of the in-court identifications made by Mrs. Stevenson. Even were we to agree with the appellants' contentions, the error is harmless beyond a reasonable doubt because their presence at the Quality Inn was firmly established by the competent, untainted identification testimony of several other witnesses.
 
 
 50
 We are also unmoved by Butler's and Miner's objections to the district court's instructions regarding the fingerprint evidence. We have read the charge with respect to this evidence and find it adequate and legally correct.
 
 
 51
 The appellants' objections on constitutional grounds to the classification of marijuana as a Schedule I controlled substance under the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C.A. § 801 et. seq., have been considered and rejected before. See United States v. Odum, 625 F.2d 626, 630 (5th Cir. 1980); United States v. Erwin, 602 F.2d 1183, 1185 (5th Cir. 1979), cert. denied, 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980); U.S. v. Gramlich, 551 F.2d 1359, 1364 (5th Cir. 1977). However, the appellants succeed on their assertion that the special parole terms imposed in connection with the convictions on the two conspiracy counts cannot stand in light of the Supreme Court's decision in Bifulco v. United States, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). See United States v. Ayala, 643 F.2d 244, 248 (5th Cir. 1981). On remand, the district court should vacate the special parole term.
 
 
 52
 There are several additional arguments which were advanced by DeSimone only. Since his conviction is reversed, we need not address those assignments of error here.
 
 
 53
 Accordingly, we REVERSE the convictions of DeSimone, AFFIRM the convictions of the remaining appellants, and REMAND for proceedings consistent herewith.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 Elder is now deceased and Iouna did not appeal his conviction
 
 
 [2]
 The record is silent as to whether DeSimone was the driver or merely a passenger in the car. An additional shred of evidence against him, but one which is assigned little or no reliance by the government, is the discovery of his fingerprint on the trunk of the yellow Caprice
 
 
 [3]
 Cf. U. S. v. Edmonds, 611 F.2d 1386, 1389 (5th Cir. 1980), where this court concluded that the four defendants were not "merely present" at a dock where bales of marijuana were being unloaded from a nearby shrimpboat. One defendant was the registered owner of the boat. He "appeared sweaty, smelled of marijuana and was covered with burlap fibers." One had been seen driving the truck into which the bales were loaded. The others, who had fled, were found hiding under a table and were also covered with fibers and residue. Their convictions of conspiracy to possess marijuana and possession with intent to distribute were affirmed
 
 
 [4]
 Cf. U. S. v. Alvarez, 625 F.2d 1196 (5th Cir. 1980), where a majority of this court sitting en banc found that the evidence of the appellant's intention to be at the off-loading site and his nodded assurance to that effect to an undercover agent manifested a prior agreement to assist in the unloading of marijuana. "A reasonable jury could very well conclude that only one with knowledge of the marijuana, and who had agreed to participate in the scheme to accomplish its importation, would promise to be on hand at a remote and unlikely area for the unloading of cargo." Id. at 1198 (emphasis added). Although DeSimone may have come physically closer to actually being on hand than did the appellant in Alvarez, we have here no inkling of an agreement which ties him to the conspiracy
 
 
 [5]
 Waldon offered no evidence at the trial, but maintains on appeal that he is a licensed pilot and that the presence of his fingerprint on the flight map evidences nothing more than the possibility that on a prior occasion, in connection with a legitimate operation, he touched a document which then remained on the plane. We find no evidence in the record to support such a statement. On appeal the issues must be determined on the basis of the trial record. Fed.R.App.P. 10(a); United States v. Willis, 639 F.2d 1335 (5th Cir. 1981); Garcia v. American Marine Corp., 432 F.2d 6 (5th Cir. 1970); see Standard Oil Co. v. United States, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976). But even if these facts were in evidence, and drawing all reasonable inferences favorable to the government therefrom, the jury could have just as reasonably found that Waldon handled the map during the episode under investigation
 
 
 [6]
 Waldon challenges the admissibility of the fingerprint evidence for reasons which we explain later in assessing Butler's assignments of error
 
 
 [7]
 Since the possession count was dismissed as to all defendants, we disregard Butler's statement that neither he nor the others possessed marijuana
 
 
 [8]
 Baughman filed an affidavit very similar to that of Butler in which he represented that his testimony would exonerate Elder and Ralston. We are unable to locate in the record any severance motions specifically founded on this affidavit. In any event, such a motion would be no more successful than those based on Butler's affirmations. Indeed, since Baughman was acquitted at the conclusion of the government's case, he was presumably available to testify on behalf of the remaining defendants
 
 
 [9]
 At the risk of further confusing the notions of severance and appointment of separate counsel, we observe that Broderick's appellate counsel maintained for the first time at oral argument that the district court erred in failing to conduct a hearing pursuant to U.S. v. Garcia, 517 F.2d 272 (5th Cir. 1975). The district judge did, in fact, address a Garcia-type inquiry to all of the defendants represented by Pitts toward the end of the trial. Although at that time Broderick expressed his satisfaction with Pitts' representation, he now complains that this inquiry was "too little and too late." However, we conclude that insofar as appellant Broderick is concerned, the trial judge never received notice of an actual conflict of interest which even necessitated a Garcia hearing. See U.S. v. Alvarez, 580 F.2d 1251, 1260 (5th Cir. 1978)
 
 
 [10]
 Since in this case the automobile was searched pursuant to a valid warrant, the Supreme Court's decisions in U.S. v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); and Robbins v. California, --- U.S. ----, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), are, we believe, inapposite. The searches challenged in those cases were all conducted without any warrant whatsoever. This line of authority merely establishes that the "automobile exception" to the warrant requirement is not to be extended to allow the warrantless search of all containers found in an automobile during the lawful, warrantless search of the vehicle itself. In other words, the Court has not extended the automobile exception beyond the reasons and justifications behind it. In this case, no exception to the warrant requirement is needed in support of the search
 
 
 [11]
 As mentioned earlier, Waldon joined in this argument on appeal. Since he was apprehended and fingerprinted under the same circumstances, he fares no better than does Butler