**UNITED STATES of America**

v.

**LEON, Pablo, Appellant in No. 83–5208**

**Case, William, Appellant in No. 83–5209**

**Pugh, David Mark, Appellant in No. 83–5210**

**Tomlinson, Clemente Roberto, Roberto Clemento Tomlinson, Appellant in No. 83–5212.**

**Nos. 83–5208 to 83–5310 and 83–5312.**

United States Court of Appeals, Third Circuit.

Argued April 9, 1984.

Decided July 12, 1984.

---

William L. Muckelroy, Trenton, N.J., Denise D. Ashley (argued), Camden, N.J., for appellant Leon.

Eli Lewis Eytan (argued), Lawrenceville, N.J., for appellant Case.

James Mullaly, III (argued), Mullaly & Mullaly, Trenton, N.J., for appellant Pugh.

Alexander W. Booth, Jr. (argued), Brownstein, Gold, Booth & Barry, Jersey City, N.J., for appellant Tomlinson.

W. Hunt Dumont, U.S. Atty., Samuel Rosenthal, Chief, Appeals Div., Michael V. Gilberti, Asst. U.S. Atty. (argued), Newark, N.J., for appellee.

Before ADAMS, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

These consolidated appeals of four co-defendants challenge judgments of conviction and sentences of confinement entered after a jury returned guilty verdicts.[1] The defendants were indicted for importing and possessing, with the intent to distribute, 35 tons of marijuana, as well as conspiracy to commit such crimes. Several motions made by appellants before, during, and after trial were denied after careful consideration by the trial judge. For the reasons given in this opinion, we affirm the four judgments of conviction and the sentences

---

1. The appeals of two other co-defendants, *United States v. Angel Roman,* No. 83–5211, and *United States v. Francisco Novaton,* No. 83–5213, have been dismissed. A total of 27 persons were charged in the indictment with (a) conspiring to knowingly and intentionally possess, with intent to distribute, as well as (b) possession with intent to distribute, approximately 35 tons of marijuana, a Schedule I controlled substance, contrary to 21 U.S.C. § 841(a)(1) & (b)(6), 21 U.S.C. § 952(a), 21 U.S.C. § 960(a)(1) & (b)(2), 21 U.S.C. § 963, and 18 U.S.C. § 2.

imposed by the district court judge which are the subjects of the above-captioned appeals.

## I.

On July 17 and 18, 1982, 27 people (including the four appellants) were arrested and approximately 35 tons of marijuana were seized.[2] Prior to trial, 12 defendants entered guilty pleas to one count of the indictment and were sentenced to jail terms ranging from 18 months to four years. The charges against four additional defendants were dismissed.

The jury trial of the remaining defendants commenced before the district court in December 1982. On January 15, 1983, after 26 days of trial and two days of deliberation, the jury returned guilty verdicts against six defendants[3] and not guilty verdicts in favor of three defendants (T. 2699–2702).

## II.

The events forming the basis of this prosecution were initiated when, on the afternoon of July 15, 1982, the Drug Enforcement Administration (DEA) received a telephone call from an unidentified male caller. The caller stated that a shipment of marijuana was scheduled to arrive that night at an isolated dock near South Amboy, New Jersey, on a white ship named the "Saetta" (having its home port at Barranquilla, Colombia). The caller informed the DEA that the marijuana would be transported from the "Saetta" by motor vehicle to upstate New York. The caller also made additional phone calls giving further specific information that was verified by subsequent events.[4]

Law enforcement officers from both federal and state agencies began surveillance of the Thomas A. Edison Rest Area on the New Jersey Turnpike in the vicinity of southbound exits 11 and 12 in an attempt to locate the tractor-trailer that the caller had identified. The tractor-trailer described in note 4 above was seen at the Edison Rest Area between exits 11 and 12 shortly after 5 p.m. on July 15. Surveillance was

---

2. At the arraignment, all defendants entered not guilty pleas and filed many pretrial motions, including motions to suppress post-arrest statements and seized evidence, motions for severance, motions for additional discovery and bills of particulars, motions for discovery into the grand jury proceedings, and for determination of materials under F.R.Evid. 404(b). The trial court conducted hearings on the defendants' pretrial motions for three weeks in November 1982 and all such motions were resolved. The court denied the motions of defendants Case and Pugh to suppress their post-arrest statements and the motion of defendant Leon challenging the search of the tractor-trailer that he was driving at the time of his arrest on the early morning of July 17, 1982, and which contained 20 tons of the marijuana. Most of the balance of the marijuana unloaded from the white ship was stored in a trailer immobilized on the dock and a bus in the dock area converted into living quarters for use by Case and his employees, including Pugh. There was no evidence, other than the testimony of defendant Case, negating the evidence of the unlimited custody which Case and his employees exercised over the dock area from July 15 to 17, 1982, prior to its seizure by the law enforcement authorities about 4:00 a.m. on July 17.

3. Subsequently, Case received a ten-year prison sentence to be followed by five years' special parole; Leon received six years in prison and three years' special parole; Tomlinson received a six-year prison sentence and ten years' special parole; Pugh received a prison sentence of four years with five years' special parole. The appeals of Roman and Novaton (two other defendants) have been dismissed.

4. Mr. Maher, a supervisory investigator of the DEA for 11½ years, testified (T. 219 ff.) that he directs the operations of an enforcement group based in the Newark, New Jersey, district office of the DEA and received this information in several phone calls, the first of which occurred about 3 p.m. on July 15, 1982. He initiated the surveillance procedures described below later that afternoon to locate a tractor-trailer rig, with the results testified to at the trial. The tractor-trailer was reported to be red and white with Florida registration plates. There was a large cross of yellow lights on the grill of the tractor. This tractor-trailer was apparently not the tractor-trailer rig that was used on the early morning of July 17 to transport the 20 tons of marijuana from the "Saetta" to the George Washington Bridge. During the trial and when the jury was not present, the trial judge signed an order returning a Peterbuilt tractor-trailer (Vehicle No. 69688 and Florida decal No. 4429949) to Rene Fernandez, the owner of the vehicle in which defendant Leon was arrested at the George Washington Bridge (T. 215–16).

set up at that Area and continued until 6 a.m. on July 16. When the vehicle was first seen, Angel Roman [5] was seated in the cab and the trailer was empty. Later that evening, the officers noticed two U–Haul trucks, one of which had been rented to defendant Pablo Leon, parked near the tractor-trailer. During this 12-hour period of surveillance, Leon, Roman, and a third defendant, Roberto Clemente Tomlinson, were seen near the three vehicles and walking in the area of the parked tractor-trailer and the two U-Haul trucks (T. 124–28, 133–34).[6] At 6 a.m. the next morning, with Leon driving the tractor-trailer (T. 226), the three vehicles drove south on the New Jersey Turnpike to exit 11, where they left the Turnpike. Shortly thereafter, the three vehicles re-entered the Turnpike at entrance 10N (northbound); one U-Haul truck exited the highway at exit 14, while the tractor-trailer and the other U-Haul truck continued north to exit 16. From exit 16, the two vehicles drove to the Lincoln Tunnel Motel where the tractor-trailer was parked in the motel parking lot. After registering at the motel, Leon and Roman drove back to the Edison Rest Area in the U-Haul truck to meet the driver of the second U-Haul truck. The two U-Haul trucks then returned to the motel. Surveillance of the Edison Rest Area, the tractor-trailer, and the motel continued for most of the following day.

While law enforcement authorities conducted such surveillance, other authorities conducted aerial surveillance in an attempt to locate the white ship described by the anonymous caller. Shortly after noon on July 16, the law enforcement authorities discovered that the ship was docked at a remote coal pier in South Amboy. Further investigation identified the ship as the "Saetta." A review of Customs Office records revealed that the "Saetta" had not reported its arrival and, therefore, had not been cleared for entry into the United States. After locating the ship, surveillance of the dock area was established from several vantage points. DEA agent Maher, the chief of surveillance, watched from the roof of an electric power station about 300–400 yards away (T. 236 ff.) while New Jersey state trooper Clifford Coyle, accompanied at times by one or two other agents, observed the dock from a small motor boat located in a nearby inlet. In addition, DEA and other law enforcement officials established surveillance from automobiles covering the roads leading to and from the dock area (T. 238–56).

Shortly after 8 p.m. on July 16, a blue and white pickup truck came to the dock area and parked adjacent to the "Saetta," which was docked with its bow facing the power station. This pickup truck was driven to and from the dock area several times during late night and early morning hours of July 16–17. At 2 a.m., the pickup led a large tractor-trailer to the dock area where the tractor-trailer parked with its back to the "Saetta". From 2:00 a.m. until approximately 3:30 a.m. there was a flurry of activity around the trailer. Many figures, seen only against a dim street light, moved around carrying bale-shaped objects between the boat and the rear of the tractor-trailer. Approximately 45 minutes after the arrival of the tractor-trailer, the pickup truck left the dock area; 30 to 40 minutes later, while the off-loading operation progressed, the pickup truck driven by Case returned, but it stopped at a position up the road from the dock area. The pickup truck then flashed its headlights on and off three separate times (T. 261–62). About 3:30 a.m., the pickup truck moved up the road

---

**5.** Angel Roman was one of the six individuals whom the jury convicted. His appeal is not currently before the court.

**6.** Detective Lombardo described Tomlinson as follows:

"A ... I observed a Hispanic male with a closely cropped Afro haircut, clean shaven, with a, what I described as a muscular build, wearing a grey T-shirt with a clown face on it.

Again, the subject, sir, was approximately in his late twenties.

"Q Did you later identify the name of that person?

"A Yes, sir, I did.

"Q What is that name?

"A Roberto Clemento Tomlinson."

(T. 127).

from the dock area. The lights on the tractor-trailer came on and it followed the pickup truck out of the dock area.[7]

The pickup truck and tractor-trailer proceeded northbound on the New Jersey Turnpike toward the George Washington Bridge. Both vehicles left the Turnpike at one point, drove slowly in and out of a rest area, and immediately thereafter returned to the Turnpike. The pickup truck and tractor-trailer separated after they returned to the Turnpike. The tractor-trailer proceeded on to the Bridge followed by surveillance cars of law enforcement officers while the pickup truck headed south back to the dock area. On the trip from the dock area to the George Washington Bridge, the speed of the tractor-trailer varied erratically; at times it accelerated to 70 m.p.h. and at other times it slowed to 35 m.p.h. When the agents who were following the tractor-trailer observed that the trailer was riding extremely close to the ground and that the driver had to shift gears frequently, they deduced that the trailer was carrying a heavy load. Based on their observations of the erratic driving speed, the transactions at the dock area, and the informant's telephone call, Customs officials and DEA agents stopped the tractor-trailer just after it arrived at the tollgate at the George Washington Bridge. On request, the driver got out of the cab and identified himself as Pablo Leon. Upon approaching the trailer, Customs officer Crosson testified that they smelled a strong odor of marijuana emanating from the rear of the trailer and noticed green vegetable matter, identified as marijuana residue, on the back ledge and bumper of the trailer (T. 446–47). The officers opened the trailer and a bale of marijuana fell out. Further investigation subsequently revealed that the tractor-trailer contained approximately 20 tons of marijuana. The agents arrested Leon at that time.

Approximately one-and-one-half hours after the tractor-trailer left the dock area, while Customs officials were following and arresting Pablo Leon, surveillance was continuing at the South Amboy dock area. At that time, DEA agent Maher, from his vantage point on top of the electric power station, observed that lights came on aboard the "Saetta" and on a green tugboat ("Julian A") and that both vessels appeared to be leaving the dock area. At this time, Mr. Maher instructed the surveillance units to close in and seal off the dock area and to arrest everyone in that area. Detectives Maltese and Krisza, among others, responded to Mr. Maher's instructions by proceeding to the South Amboy dock in their vehicles. Upon his arrival, Detective Maltese noticed that several individuals scattered. Detective Maltese shouted to the individuals in English and Spanish, "I am a police officer" and he directed them to "freeze" (T. 710). Only one individual responded, and Detective Maltese arrested defendant Roman.[8] After arriving, Detective Krisza proceeded toward the pier area where he boarded a tugboat. On the topmost portion of one of Case's tugboats,[9] the "Last Chance," Krisza "saw two individuals lying face down on their stomachs

---

7. State Trooper Coyle testified that when the tractor-trailer was at the dock, the pickup truck stopped on its way down to the dock at a point where it was visible to those in the dock area and "flashed its lights on and off ... for ... a minute or so ... back and forth, flashing them on and off" (T. 1893). Also, he testified that the tractor-trailer "backed up" with the rear section "on a tangent with the" "Saetta" (T. 1894–95; see exhibit G–2). During the time the "Saetta" was at the dock, Coyle testified that there was "a lot of activity [on the dock], people milling around quite frequently, walking back and forth, again carrying these large objects on their shoulders, and people walking in front of the truck, on the side of it, people walking on the back part of it ... and there was a lookout, evidently on the fantail of the boat ... in question." According to Coyle, the activity lasted "all the time the tractor-trailer was there" (T. 1895).

8. The first individual with whom he came in contact, Angel Roman, did not freeze until Detective Maltese "drew" his service revolver.

9. Defendant William Case is the owner of two of the tugboats involved in the case, the "Julian A" and the "Last Chance." In addition, he was renting the South Amboy dock area.

... in a flat, small area." [10] Krisza arrested both individuals, the first of whom he identified in court as Roberto Clemente Tomlinson.

During their search for suspects, the agents found more marijuana not far from where the men were hiding. They found approximately ten tons of marijuana inside a large trailer near the dock and forty bales of marijuana in the bus owned by Case (see note 2 above) that served as Pugh's residence.

While detectives carried out these efforts on land, State Trooper Coyle and two others in the Boston whaler were active in the channel leading to the dock. Coyle testified that one of Case's other tugboats, the "Julian A," hooked up to the "Saetta" and towed it into the channel. After entering the channel, the two boats proceeded side-by-side toward Sandy Hook and the ocean. After pursuing the boats for nearly an hour, Coyle caught up to the boats, pulled up in the middle of them, and yelled in English and Spanish "Police, halt" (T. 1903). Coyle further testified that the two boats made repeated efforts to "squash" and capsize his motorboat. When these efforts were unsuccessful, the two boats separated and Coyle pursued the "Saetta." After the occupants of Coyle's boat fired several shots across the bow of the "Saetta," the "Saetta" stopped and permitted Coyle to board. After boarding Coyle took the boat to the Coast Guard receiving dock in Perth Amboy.[11] A few minutes later, a Coast Guard cutter intercepted the "Julian A," arrested Case, its captain, and the three others onboard, including Pugh.

After a 26-day trial and two days of jury deliberations, the jury returned guilty verdicts against Leon, Case, Pugh, Tomlinson, and two other co-defendants. Also, the jury returned not guilty verdicts against defendants Aday, Lopez, and Deus (T. 2699–2702).

**10.** Krisza testified that the small area was "[m]aybe five feet by six feet or something; five feet by seven feet" (T. 1091).

**11.** A search of the "Saetta" revealed a large amount of marijuana residue lying on the deck

### III.

In this appeal, appellants challenge the district court's rulings on several motions made before, during, and after trial. Two challenges raised by defendants Pugh and Tomlinson deserve particular attention. Both Pugh and Tomlinson contend that the district court erred by denying their motions for acquittal and for a new trial because the evidence adduced at trial was insufficient to support their convictions.

■■■ In reviewing the sufficiency of the evidence to support the convictions of Pugh and Tomlinson, we are mindful of the Supreme Court's decision in *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In *Glasser*, the Court stated:

> "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."

*Id.* (citation omitted). Recently, the Court reaffirmed this holding. In *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978), the Court stated:

> "The prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt.... Obviously a federal appellate court applies no higher a standard; rather, it must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision.... While this is not the appropriate occasion to re-examine in detail the standards for appellate reversal on grounds of insufficient evidence, it is apparent that such a

and in the hold and a set of navigational charts with markings reflecting a journey from Barranquilla, Colombia, to the Sandy Hook Bay in New Jersey.

decision will be confined to cases where the prosecution's failure is clear."

*Id.* (citations omitted). Moreover, "[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." *United States v. Allard*, 240 F.2d 840, 841 (3d Cir.), *cert. denied*, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957). *See also United States v. Cooper*, 567 F.2d 252, 253 (3d Cir.1977) (recognizing the *Glasser* and *Allard* standards). Finally, when examining the sufficiency of the evidence, the court reviews the totality of the circumstances. *See Government of the Virgin Islands v. Greene*, 708 F.2d 113, 115 (3d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1004, 79 L.Ed.2d 236 (1984); *United States v. Blasco*, 702 F.2d 1315, 1332 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 275, 78 L.Ed.2d 256 (1984). Because we are unconvinced that the "prosecution's failure [was] clear" [12] and because the evidence does establish a case from which the jury could find these four defendants guilty beyond a reasonable doubt, [13] we are unwilling to disturb the district court's final orders.

### A. *United States v. Pugh, No. 83–5210*

■ The record provides sufficient circumstantial evidence to establish a case from which a jury could find Pugh guilty, beyond a reasonable doubt, of both conspiracy and aiding and abetting the substantive crimes charged. The basic elements of the Government's case are these: First, Pugh was observed driving the blue and white pickup truck at the Edison Rest Area on the morning of his arrest sometime between 3:00 and 3:45 a.m. (T. 1361–64). This was about the same time that Agent Maher testified that he saw the pickup truck lead the tractor-trailer from the dock area to the Turnpike enroute to the George Washington Bridge (T. 262). The inference to be drawn from this evidence is that Pugh, who was a deckhand in Case's employ and had access to the pickup truck, [14] was the driver of this pickup truck as it led the tractor-trailer, driven by Leon and laden with the contraband, away from the South Amboy dock.

Second, Pugh was a crew member on Case's boat ("Julian A") when it assisted the "Saetta" out of the dock area and was on this tug when it was captured by the Coast Guard. Third, 41 bales of marijuana were placed in the bus in which Pugh was living (T. 1448–49; Ex. 10B, 11AA–JJ, 11AAA–JJJ) on the morning of July 16 at a time when he was in the vicinity and could have objected to such illegal use of his abode in violation of the criminal law.

Viewing the foregoing evidence in light most favorable to the prosecution, we are persuaded that the totality of the circumstances justified the district court's decisions to deny Pugh's motions for acquittal and for a new trial. [15] Accordingly, we will affirm these rulings.

### B. *United States v. Tomlinson, No. 83–5212*

■ Similarly, we conclude that the record supports a jury finding that Tomlinson participated in the conspiracy to import marijuana into the United States at South Amboy, New Jersey, in July 1982 and that he aided and abetted in the substantive offense involving such importation (T. 1389–1405). The basic elements of the

---

**12.** *See Burks v. United States, supra,* 437 U.S. at 17, 98 S.Ct. at 2150.

**13.** *See United States v. Allard, supra,* 240 F.2d at 841.

**14.** Law enforcement officers had seen Pugh on the early morning of July 16 at the Edison Rest Area, driving Case's pickup truck, which contained a distinctive, 55-gallon, oil drum container (T. 169–174).

**15.** Defendant Pugh places a great deal of reliance on *United States v. DeSimone,* 660 F.2d 532 (5th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). Since its decision in *DeSimone,* the Fifth Circuit has been split into the Fifth and Eleventh Circuits. The Eleventh Circuit has consistently refused to read *DeSimone* as broadly as Pugh would have us read that case. *See, e.g., United States v. Castro,* 723 F.2d 1527, 1534–35 (11th Cir.1984); *United States v. Blasco,* 702 F.2d 1315, 1331–32 (11th Cir.1983).

Government's case against Tomlinson are essentially twofold. First, as described in part II of this opinion, one day before the marijuana was unloaded Tomlinson was seen at the Edison Rest Area in the vicinity of defendants Roman and Leon, who had three vehicles under their control: two U-Haul trucks and the tractor-trailer, which DEA agents had under surveillance as a result of one of the anonymous telephone calls.[16] Witness Lombardo, a detective with the Middlesex County Prosecutor's office, who observed the Edison Rest Area, exhibited no hesitation in walking across the courtroom to identify Tomlinson at the trial and in testifying to the clothing he was wearing on July 15–16, 1982 (T. 127).[17]

Second, after the departure of the "Saetta" from the South Amboy dock at approximately 5:00 a.m. on the morning of July 17, the law enforcement authorities moved in to seal off the area and directed fleeing individuals to "freeze" and submit to custodial detention. When the individuals failed to comply, the authorities conducted a search of all the vessels located at the dock and of the water under the piers. During this search, Tomlinson and defendant Deus[18] were found lying face down on their stomachs in a 5' × 7" space on the top deck of the "Last Chance" tugboat, owned by Case who had active custody of the dock area, an act which the jury could have interpreted as an effort to avoid police detection. They were arrested and taken into custody without explaining why they had not come forward when Detective Maltese shouted to the individuals in the dock area and directed them to "freeze" (T. 710).

Initially, we recognize that the evidence against Tomlinson was not as strong as that offered against some of his convicted co-defendants. Tomlinson contends that he was convicted solely because of his presence at the Edison Rest Area 24 hours prior to his arrest. Although we agree with Tomlinson's contention that presence alone is insufficient, see DeSimone, 660 F.2d at 537, the totality of the circumstances viewed in the light most favorable to the Government, Glasser, 315 U.S. at 80, 62 S.Ct. at 469, demonstrates more than mere presence at the scene of a crime. First, the crime scene in this case is hardly an ordinary one into which an innocent person might wander. The South Amboy dock area is situated in a secluded area, one well suited to off-loading contraband. The arrest was made in the early morning hours after the unloading operation, consisting of people walking between the "Saetta" and the truck carrying large objects on their shoulders, had been carried out under cover of darkness "with a lot of activity" (T. 1895) for approximately one and one-half hours. Tomlinson was found just yards from where the unloading had taken place and a short distance from where a great deal of the marijuana was located. While

16. See T. 124–27, 219–20, 225.

17. On at least two separate occasions, it is noted that the jury asked to have the court read back to it the testimony of agent Lombardo, who testified to seeing Tomlinson at the Edison Rest Area during the night of July 15–16, and that of agent Maher. This indicates the jury's confidence in such testimony. Among other parts of the trial transcript which the jury asked to have reread to it during its deliberations were the arrival and departure times of the tractor-trailer at the dock on the morning of July 17, the testimony of specific important witnesses, and the trial judge's definition of each count of the indictment (T. 2675–98). The trial judge stated to counsel several times during the trial his evaluation of how unusually conscientious the jury appeared to be. At the end of the trial, the district court judge stated to the jury:

"Mr. Foreman, ladies and gentlemen of the jury, this has been a long trial. I hope you won't mind my saying something to you at this late hour, which I assure you is heartfelt.

"I consider jury service to be the highest form of public service. May I say to each and every one of you that I think that you have carried out your duties as jurors in this case splendidly. I commend you for your patience, not only with the Court, but all parties in this case. You can be very proud of the system, the system that we have in this blessed land.

"And so I thank each and every one of you for giving us so much of your time, so much of your effort during these many, many, long days."

(T. 2702).

18. Mr. Deus was acquitted by the jury. Consequently his case is not before this court.

even this proximity alone might be insufficient as showing mere acquiescence and not participation, *but cf. United States v. Castro,* 723 F.2d 1527, 1534–35 (11th Cir. 1984); *United States v. Blasco,* 702 F.2d 1315, 1331–32 (11th Cir.1983), critically Tomlinson was observed also at the Edison Rest Area, on the night before the unloading of the contraband, in the vicinity of the tractor-trailer identified in one of the anonymous telephone calls and of Pablo Leon, who was apprehended the next night at the George Washington Bridge as the driver of the tractor-trailer containing the marijuana. Although there may be innocent explanations consistent with these facts, we think that a reasonable jury could infer from these circumstances that Tomlinson was not present for some innocuous reason, but was involved in the conspiracy to import, possess, and distribute marijuana and was guilty of the substantive offenses as well. *See* 18 U.S.C. § 2(a).[19] Accordingly, we will affirm the district court's decisions to deny Tomlinson's motions for acquittal and for a new trial.

Finally, we have considered all of the other contentions of the appellants and reject each of them.[20]

---

19. Title 18 U.S.C. § 2(a) provides:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

The district court correctly recognized that presence at the scene of the crime, association with persons involved in a criminal enterprise, and presence followed by flight, when considered independently, were inadequate to sustain a conspiracy conviction. Instead, the totality of the circumstances is critical. In the course of its charge to the jury, the court stated:

"Now, mere association with persons involved in a criminal enterprise is insufficient to prove participation in a conspiracy. Mere presence at the scene of the crime is not enough to sustain a conspiracy conviction. Mere presence followed by flight is also inadequate proof.

"You should be convinced beyond a reasonable doubt from the evidence that a defendant conspired to import and distribute marijuana. The intentional flight or concealment of a defendant immediately after the commission of a crime, while not sufficient in itself to establish his guilt, is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case, in determining guilt or innocence. Whether or not evidence of flight or concealment shows a consciousness of guilt, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.

"In your consideration of the evidence of flight or concealment, you should consider that there may be reasons for this which are fully consistent with innocence." (T. 2675–77).

20. First, the Supreme Court's decision in *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 752 (1982), is dispositive of Leon's contention that the search of the tractor-trailer he was driving constituted an illegal search and seizure. Second, we find that the district court's decision to admit two airline tickets of Mr. Case for travel from Miami to Newark in March 1980 did not constitute an abuse of discretion. *See United States v. Long,* 574 F.2d 761, 767 (3d Cir.1978), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). Third, we reject Case's contention that the district court should have granted a mistrial in light of Coyle's statement that he feared for his life when he boarded the "Saetta." The district judge has considerable discretion in determining whether to grant a mistrial. *See United States v. Jorn,* 400 U.S. 470, 485–86, 91 S.Ct. 547, 557–58, 27 L.Ed.2d 543 (1971). We do not think the district judge abused his discretion by denying defendant's motion. Fourth, we reject defendants' contention that an offhand comment by Trooper Coyle to the jury was grounds for a mistrial. Although a private communication between a witness and a juror is presumptively prejudicial in a criminal case, *Remmer v. United States,* 350 U.S. 377, 379, 76 S.Ct. 425, 426, 100 L.Ed. 435 (1956), when the record rebuts the presumption of prejudice a mistrial need not be granted. *United States v. Hines,* 696 F.2d 722, 731 (10th Cir.1982). Although the communication was unfortunate, our review of the record convinces us that the witness' innocuous statement that "I always wanted to be a teacher" was not prejudicial (T. 1917). Moreover, the district court's refusal to permit cross-examination of Coyle on his remark was not an abuse of discretion. *United States ex rel. Abdus-Sabur v. Cuyler,* 653 F.2d 828, 833 (3d Cir.), *cert. denied,* 454 U.S. 1088, 102 S.Ct. 650, 70 L.Ed.2d 625 (1981). Fifth, we reject defendants' contention that the district court erred by refusing to charge "*Falsus in uno, falsus in omnibus.*" The court's charge on the credibility of witnesses adequately covered the evidence in this record (T. 2662). *See United States v. Weinstein,* 452 F.2d 704, 713–14 (2d Cir.1971). Sixth, we affirm the district court's decision to admit the unsolicited statements of Case and Pugh because the statements did not violate the Supreme Court's directive in *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1965). *See supra* note 15.

The district court orders of judgment and conviction will be affirmed.