UNITED STATES of America

v.

Yaffa LEVY, a/k/a "Annette Amar",
Appellant in No. 87–5595,

UNITED STATES of America,

v.

Moshe GOZLON–PERETZ, a/k/a
"Pasquale DiStefano", Appellant
in No. 87–5596,

UNITED STATES of America,

v.

YEHUDA, Ellus, a/k/a "Holly Berthold"
Appellant in No. 87–5613.

Nos. 87–5595, 87–5596 and 87–5613.

United States Court of Appeals,
Third Circuit.

Argued June 15, 1988.

Nos. 87–5595 and 87–5596
Reargued En Banc June 15, 1988.

No. 87–5613 Submitted Pursuant to
Third Circuit Rule 12(6) Nov. 7, 1988.

Decided Jan. 9, 1989.

Samuel A. Alito, Jr., U.S. Atty., Michael V. Gilberti (argued), Asst. U.S. Atty., Newark, N.J., for appellee.

Roger Bennet Adler (argued), Roger Bennet Adler, P.C., New York City, for appellant Yaffa Levy.

Peter Goldberger, Pamela A. Wilk (argued), Alan Ellis, Law Offices of Alan Ellis, P.C., Philadelphia, Pa., for appellant Moshe Gozlon–Peretz.

Salvatore J. Avena, Avena, Friedman and Klamo, Camden, N.J., for appellant Ellus Yehuda.

Argued June 15, 1988

Before MANSMANN, SCIRICA, and COWEN, Circuit Judges.

Reargued En Banc June 15, 1988

Before SEITZ, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA and COWEN, Circuit Judges.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

I.

Appellants Yaffa Levy and Moshe Gozlon–Peretz were convicted by a jury in the United States District Court for the District of New Jersey on three counts. Count One of the Superseding Indictment charged participation in a conspiracy to distribute more than a kilogram of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1982). Count Two charged distribution of approximately 240 grams of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (1982). Count Three charged possession with intent to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Prior to the trial, appellant Ellus Yehuda, a codefendant, pleaded guilty to possession with intent to distribute two kilograms of heroin.

At trial, the government relied primarily upon the testimony of Special Agent Paul Maloney, an undercover DEA agent, to convict defendants Levy and Gozlon–Peretz of, *inter alia*, conspiracy to distribute heroin on or about February 26, 1987. While Maloney was on the stand, the government elicited testimony concerning out of court statements made by Yehuda during the negotiations leading to the sale of the heroin to Maloney. The government tendered much of that testimony as probative of the truth of the assertions made by Yehuda. After Levy and Gozlon–Peretz objected to the admissibility of this evidence on hearsay grounds, the government urged that it was admissible under Federal Rule of Evidence 801(d)(2)(E) as statements made "by a coconspirator of a party during the course and in furtherance of the conspiracy." The district court applied the then governing circuit precedent, *United States v. Ammar*, 714 F.2d 238 (3d Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983), and admitted the tendered evidence. Its action was premised

on a finding pursuant to the *Ammar* standard that the record evidence, without reference to the purported co-conspirator statements, made it more likely than not that those statements were made in furtherance of a then existing conspiracy of which the defendants were members. Yehuda was available to testify at the trial but neither side chose to call him to the stand.

After the defendants were sentenced and while their appeals were pending before this court, the Supreme Court of the United States decided *United States v. Bourjaily,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In that case, the Court disapproved the test articulated in *Ammar,* holding that a trial judge may consider all evidence, including the tendered out of court statements of the alleged co-conspirator, in deciding whether to admit the statements.

Several issues are raised in this appeal from the defendants' convictions: 1) whether there was sufficient independent evidence under this court's decision in *Ammar* to warrant the admission under Rule 801(d)(2)(E) of the out of court statements made by alleged co-conspirator Yehuda; 2) whether the false passports of the defendants and their use of false names were properly admitted into evidence; 3) whether, assuming the admissibility of the co-conspirator statements and the evidence regarding false identification, there was enough evidence to support Levy's and Gozlon–Peretz's convictions; 4) whether retroactive application of *Bourjaily* to this case would violate notions of fundamental fairness inherent in the Due Process Clause of the Fifth Amendment; 5) whether, assuming *Bourjaily* is to be applied retroactively, there was sufficient evidence to permit the admission of the co-conspirator statements; 6) whether there is an unacceptable risk that the sentences imposed on Gozlon–Peretz and Yehuda were influenced by a misunderstanding on the part of the sentencing judge regarding the parole provisions of the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, §§ 1002, 1003, 100 Stat. 3207–2 (codified at 21 U.S.C. § 841(b)(1) (Supp. IV 1986)); and 7) whether the district court erred in failing to make factual findings regarding Yehuda's ability to pay the $200,000 fine imposed upon him.

In keeping with the preferred practice of avoiding unnecessary decisions of constitutional issues, we first address the issue of whether the district court properly applied the *Ammar* standard when it admitted Yehuda's out of court statements. Because we hold that there was enough independent evidence to warrant the admission of these statements under *Ammar,* we do not reach the issue of whether *Bourjaily* could be applied here without violating due process. We also hold that the false passports and use of false identities were admissible, and that there was sufficient evidence to support Levy's and Gozlon–Peretz's convictions. We will vacate the sentences of Gozlon–Peretz and Yehuda, however, and remand for resentencing.

## II.

In March, 1986, a government informant introduced Special Agent Paul Maloney of the Drug Enforcement Agency to Yehuda. For the next eleven months, Maloney, acting in an undercover role, negotiated with Yehuda in an attempt to purchase large quantities of heroin. During these eleven months Maloney had approximately fifteen to sixteen telephone conversations and half a dozen "face-to-face" meetings with Yehuda. At each of the approximately six "face to face" meetings, Yehuda and Maloney tried to negotiate a heroin transaction. None of these transactions were ever consummated; the main sticking points were Yehuda's demand that Maloney give him money "up front" before delivery of the heroin, and Yehuda's apparent inability to obtain and produce any heroin despite his repeated promises. During these negotiations Yehuda stated that he had one source of heroin in Chicago and two in Thailand.

On February 24, 1987, Yehuda called Maloney at his Atlantic City office and said that "he had something" for Maloney. They agreed to meet the next afternoon at the Pennsylvania railroad station in Newark, New Jersey. They met as arranged. During the meeting Yehuda reported that

he had met "a friend" in New York whom he had previously seen in Thailand and that his friend had entered the United States with about five kilograms of heroin. Yehuda then gave Maloney a small package which later analysis revealed contained 23.6 grams of 27 percent pure heroin hydrochloride. Upon receiving the sample, Maloney told Yehuda that he would return with it to Atlantic City and have it tested; he added that if everything worked out well, he would want to buy at least one kilogram. Yehuda responded that the price would be about $200,000 per kilogram and that he would have to check with his friend to make sure everything was all right.

At this point, Maloney and Yehuda proceeded to a pay phone in the sky walk connecting the station and the Hilton Hotel. Maloney asked Yehuda if the transaction could be consummated in Atlantic City because he not only felt safer there but could also guarantee everyone else's safety. Yehuda replied that he would check this with "his man." Upon reaching the phone, Yehuda, referring to a piece of paper, punched in a series of numbers and hung up the phone. In response to Maloney's question as to whether the line was busy, Yehuda said that he had to call a beeper number and that his call would be returned. Maloney read from Yehuda's paper one of the numbers, 401–4532, that Yehuda had used. Several minutes later Yehuda received an incoming call on the pay phone. The call lasted several minutes and was carried out in a foreign language.

After this second call, Yehuda said that it was agreed that the transaction would be done in Atlantic City, but that his friend wanted to do it one pound at a time. Yehuda explained that "his friend" wanted Yehuda to deliver one pound to Maloney, receive $110,000, then go back to get the second pound and deliver it to Maloney in return for the remainder of the purchase price ($90,000). In response to Maloney's concern about completing the transaction anywhere but Atlantic City, Yehuda said that since Maloney was the buyer, "they" would complete it wherever he wanted.

The government subsequently obtained records from a Novotel Hotel in New York City which showed that a phone call had been made to the pay phone in the Newark skywalk at 1:44 pm on February 25, 1987 from a room registered to Annette Amar, an alias used by Yaffa Levy.

At 6:55 pm the next day, Levy, Gozlon–Peretz and Yehuda arrived together at the Sands Hotel; Levy rented room 1002 using an Israeli passport in the name of Annette Amar. The hotel desk clerk testified that she saw a full red bag among the defendants' luggage. At 7:05 pm Yehuda and Maloney met at an arranged spot in the Golden Nugget Hotel lobby; Yehuda was carrying a large red bag. After proceeding to Maloney's hotel room in the Golden Nugget, Yehuda stated that he had come to Atlantic City with "his friend" and asked Maloney if he had a balance that he could borrow as his had been too bulky to bring. Maloney lent Yehuda his electronic scale, and Yehuda put it into his red bag. Yehuda stated he was going to leave the scale with "his friend" while he, Yehuda, brought the first installment of drugs to Maloney. Yehuda was to have returned the scale with the second installment, at which point Maloney would have used the scale to weigh the total delivery. They then returned to the lobby and Maloney asked Yehuda if he wanted to call his friend prior to meeting him. Yehuda declined to call, stating that "his friend" was "there" and he would go "right to there." Appendix at 56.

Yehuda was followed by a detective Imfeld of the Atlantic City Police Department from the Golden Nugget Hotel to the Sands Hotel. Yehuda hired a taxi and took a very circuitous route back to the Sands Hotel, which included retracing his steps and making a "U" turn. Yehuda also repeatedly looked out the back window during the ride. When he arrived at the Sands Hotel he walked in circles and looked around the lobby for fifteen minutes. Yehuda then went to the elevator bank and waited for an empty elevator. Once in the elevator, Yehuda kept it on the ground floor for a "good minute" and then pushed the fifth and tenth floor buttons. After

the elevator went to the tenth floor it came straight down empty.

At 8:40 pm Yehuda, carrying the red bag still containing the scale, returned to the Golden Nugget. Yehuda told Maloney that "his friend" had told him that Yehuda must see or obtain at least half the money before proceeding further. Maloney replied that this was unsatisfactory and that they had already agreed on the structure of the exchange. Yehuda then said that "it was difficult, that he had no control over it, that he was—you know, he was caught in the middle." *Id.* at 57. Maloney told Yehuda that if he had to "front" the money, the sale was off, but he did ask Yehuda to call his friend and see if a compromise could be worked out. Yehuda went to a pay phone, asked Maloney to walk around, and then talked in a foreign language for less than five minutes. After the telephone conversation, Yehuda reported to Maloney that it might be possible for Yehuda to deliver 100 grams to Maloney, at which point Maloney would show Yehuda the money. Although Maloney agreed to this arrangement, Yehuda said that he had to await another phone call as he "hadn't spoken to the guy but had spoken to his girlfriend who was in the hotel room, that the man wasn't there and that she could only say that the guy would probably give [Maloney] a hundred grams." *Id.* at 58.

Yehuda received the return call at the pay phone shortly thereafter and talked for a couple of minutes in a foreign language. Upon completing the call, Yehuda reported to Maloney that "his friend" was adamant about seeing the money first and that if he did not the transaction would not be completed. Maloney rejected the new terms, made a counter offer, and asked Yehuda to call his friend again. Yehuda complied, using the same phone as before. Maloney reported that after Yehuda placed the call, he heard Yehuda ask for room 1002 in English. After this call, Yehuda reported that "his friend" would not agree to Maloney's suggestion. They then walked through the lobby arguing about the fact that Yehuda had agreed to complete the sale one way but was now changing the

agreement. During this exchange, Yehuda said that he was as surprised as Maloney when the plans were changed and that "it was difficult being caught in the middle, that he was caught between two hard dealing people, that [Maloney] wouldn't bend and his friend wouldn't bend and that he hated doing business that way." *Id.* at 60.

At 10:55 pm Yehuda, carrying the red tote bag, rented room 1430 at the Sands Hotel using the name "Holly Berthold." At approximately 11:15 pm Maloney received a message on his beeper to call a certain number. The number was that of a pay phone in the lobby of the Sands Hotel; Yehuda answered it. Yehuda told Maloney that his "friend" had relented and that he was willing to do the transaction the way Maloney had suggested; the first installment, however, was to be only 250 grams. Maloney agreed to these terms and arranged to meet Yehuda a little later.

Maloney and Yehuda met around 11:45 pm. Yehuda gave Maloney a package containing 185 grams of heroin. Moments later agents moved in and arrested Yehuda.

During the subsequent search of rooms 1002 and 1430 and the associated follow-up investigation, additional evidence was discovered. Two calls were placed from room 1002 to the pay phone Yehuda had been using the evening of February 26, 1987; one had been placed at 8:59 pm and the other at 9:55 pm. The times coincided with Yehuda's telephone conversations in Maloney's presence. During a search of room 1002, the following items were found: 1) a beeper, on a shelf near the bed with the number 401–4532 inscribed on its back; 2) foreign passports in the names of Pasquale DiStefano and Annette Amar; 3) two consecutively numbered Greyhound bus tickets from New York to Resorts International; and 4) a bill from the New York Novotel Hotel. A third Greyhound bus ticket, with a number consecutive with the two seized in room 1002, was found on Yehuda's person.

A search was also conducted of room 1430 rented by Yehuda using a passport

issued in the name of Derthon Holly.[1] During the search 2,127 grams of 24 percent heroin hydrochloride and a red tote bag were recovered.

When questioned after their arrest, Gozlon–Peretz and Levy identified themselves by the aliases Pasquale DiStefano and Annette Amar respectively.

### III.

### A.

■ Federal Rule of Evidence 801(d)(2)(E) provides that out of court statements made by a "coconspirator of a party during the course and in furtherance of the conspiracy" are not hearsay. The requirements of the rule are met if the person against whom the statement is offered participated in a conspiracy, the statement was made in furtherance of the conspiracy, and the conspiracy was still in progress at the time the statement was made. *Ammar*, 714 F.2d at 245; *United States v. Gibbs*, 739 F.2d 838, 843 (3d Cir.1984) (en banc), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985). As we have noted, before *Bourjaily* this court required the prosecution to demonstrate these three facts by a "fair preponderance of the independent evidence." *Gibbs*, 739 F.2d at 843 (quoting *United States v. Trotter*, 529 F.2d 806, 811–813 (3d Cir.1976)); *see Ammar*, 714 F.2d at 247. Thus, an out of court statement offered as a statement of a coconspirator was admissible only if evidence other than the statement itself made it more likely than not that the defendant participated in the alleged conspiracy and that the statement was made during and in furtherance of that conspiracy. *See Gibbs*, 739 F.2d at 843, (quoting *Trotter*, 529 F.2d at 812 n. 8). The trial judge in this case correctly identified this as the then governing standard.

Levy and Gozlon–Peretz assert that the independent evidence falls short of establishing by a preponderance of the evidence that they participated in a conspiracy with Yehuda. They do not dispute that if such a conspiracy were shown, the statements could be found to have occurred in furtherance and in the course of that conspiracy. Thus, in reviewing the district court's decision to admit Yehuda's statements under *Ammar*, our inquiry is restricted to "whether, viewing the [other] evidence in the light most favorable to the government, the district court had 'reasonable grounds' for concluding that, more probably than not, [the defendants] were coconspirators." *United States v. Inadi*, 748 F.2d 812, 817 (3d Cir.), *rev'd on other grounds*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986); *see United States v. Janotti*, 729 F.2d 213, 218 (3d Cir.1984), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1984). We hold that the district court did have reasonable grounds for so concluding.

We start with the undisputed proposition that Yehuda went to Atlantic City in February of 1987 to offer for sale and deliver a substantial quantity of heroin. It is equally clear that Yehuda was accompanied on this trip by Levy and Gozlon–Peretz and that they occupied the same hotel room during most of the time the negotiations were ongoing. Accordingly, the issue for decision is whether there is independent evidence which, when added to Levy's and Gozlon–Peretz's association with Yehuda and their proximity to the transaction, permits an inference that they were involved in the selling of the heroin. We now turn to that evidence.

The independent evidence established that Yehuda repeatedly interrupted the negotiations to use the telephone and that he repeatedly changed his position immediately following such use. Two explanatory hypotheses have been advanced by the parties in connection with this evidence. Levy and Gozlon–Peretz suggest that Yehuda was negotiating solely on his own account and was using the apparent telephone calls as a ruse to put himself in a better bargaining position. The government, on the other

---

**1.** The hotel clerk apparently miscopied the name in Yehuda's false passport, misreading

Holly Berthold for Derthon Holly.

hand, urges that Yehuda was acting as a broker whose role was to bring Maloney together with a party who had a large quantity of heroin to sell. Based on the independent evidence, we conclude that the district court could properly infer that Yehuda was not dealing on his own account and that the calls involved conversations with co-conspirators. Moreover, having drawn this inference, we believe the district court had ample reason to further conclude that Levy and Gozlon–Peretz were the co-conspirators whom Yehuda contacted by telephone.

First, with respect to Yehuda's role in the transaction, we find it significant that during the eleven months leading up to the February sale, Maloney had been attempting unsuccessfully to purchase heroin from Yehuda. Despite many promises to provide Maloney with samples, Yehuda had never been able to produce any heroin. In fact, one of the sticking points between Maloney and Yehuda in their negotiations was Maloney's refusal to finance Yehuda's excursions abroad to obtain heroin and arrange for suppliers. If Yehuda had had the ability to supply heroin on his own account, it would seem likely that he would have fulfilled his promises and delivered heroin to Maloney during their many dealings in 1986. His failure to do so is supportive of the inference that he was not dealing on his own account in February of 1987.

In addition, the nature of the sticking points in the February 25th and 26th negotiations were not over price or purity, as one would expect if Yehuda were the supplier trying to use clever bargaining strategy to increase his profits; rather Yehuda and Maloney haggled over who should perform first. Yehuda wanted Maloney to pay before he delivered the drugs, and Maloney wanted the transaction done in two steps, with half of the drugs being exchanged for half of the money at each stage. These disagreements are more characteristic of a broker taking instructions from a cautious supplier who did not know or trust the buyer, than of a supplier trying to drive a hard bargain with a known purchaser.

Finally, the district court was entitled to credit Maloney's evaluation that Yehuda was genuinely frustrated by finding himself "caught in the middle" and unable to consummate the transactions as planned. That frustration is supportive of the inference that Yehuda was not dealing solely on his own account and that the telephone calls were conversations with his co-conspirators.

Second, with respect to the identity of Yehuda's co-conspirators, we find the inference for which the government contends compelling. The first call made by Yehuda in Newark was placed to a beeper later found in the Sands hotel room engaged by Levy and occupied by Levy and Gozlon–Peretz. That call was returned from the New York Novotel Hotel room also occupied by them. Likewise, in Atlantic City, Yehuda made at least one call to room 1002 and two of his other calls were returned from that room.

Moreover, there are three other indications that Levy and Gozlon–Peretz were the ones in league with Yehuda. It can be inferred that the 'counter surveillance' techniques used by Yehuda on his way to the Sands Hotel from his 7:05 pm meeting with Maloney were an attempt to protect the people and drugs in room 1002 from detection. In addition, the absence of other contacts between Yehuda and third parties, as revealed by police surveillance, tends to exclude the likelihood of an unknown third party being the supplier. Finally, the 'guilty consciousness' demonstrated by Levy and Gozlon–Peretz in giving false names upon arrest also tends to indicate that they were not just innocent bystanders vacationing in Atlantic City.

For these reasons, we conclude that there was sufficient independent evidence to make it more likely than not that Levy and Gozlon–Peretz were participants with Yehuda in a conspiracy to distribute heroin. We find that independent evidence every bit as probative of a conspiracy as the independent evidence in *Gibbs,* 739 F.2d 838, and in *United States v. Leon,* 739 F.2d 885 (3d Cir.1984). Contrary to appellants' contention, we also find our conclusion en-

tirely consistent with *United States v. Wexler*, 838 F.2d 88 (3d Cir.1988), in which the court concluded that a defendant who aided in the transportation of a truck containing illegal drugs did not have reason to know that the truck contained anything other than stolen goods. First, in this case, unlike *Wexler*, there is evidence from which one can rationally infer that the defendants were the suppliers of the drugs. Second, in *Wexler* the government had to show enough evidence to support a *conviction*, a far heavier burden than it labors under here.

### B.

■ Levy insists that the district court erred in admitting evidence of her possession of a passport issued in the name of Annette Amar and of her use of that fictitious name. Making reference to the "international traveling statutes," she characterizes this evidence as "other crimes evidence" and asserts that, even if it has some relevance, its probative value is outweighed by its potential for undue prejudice. Gozlon–Peretz makes a similar argument. We are unpersuaded.

The use of false passports and identities by the defendants is relevant for at least three reasons. First, defendant Levy's use of her "Annette Amar" alias in checking into the two hotel rooms, supports the government's contention that she was the "front person" for Gozlon–Peretz and Yehuda, protecting their identities while they completed the heroin sale. If the sale had been consummated as planned, the only direct link to Gozlon–Peretz would have been the fading memory of the Sands Hotel desk clerk. Thus, the use of the false identity could be seen as part of the defendants' plan in implementing the conspiracy, a safety measure to protect Gozlon–Peretz in case the buyer was later arrested. Second, the defendants' attempt to conceal their true identities by providing aliases to the police upon arrest is relevant as consciousness of guilt. *United States v. Kal-*

*ish*, 690 F.2d 1144, 1155 (5th Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958; *see also United States v. Boyle*, 675 F.2d 430 (1st Cir.1982); *Leon*, 739 F.2d at 893 n. 19. Finally, the use of false identities by all three conspirators also tended to show joint planning and coordination by the defendants in an attempt to protect themselves from future investigation and pursuit.[2]

Federal Rule of Evidence 404(b) was not violated because the challenged evidence thus tended to show preparation, plan, and state of mind. Similarly, we conclude that Rule 403 was not breached because this evidence had significant probative value and very little, if any, potential for undue prejudice. Evidence of illegal entry into the United States is not likely " 'to suggest a decision on an improper basis, [for instance] an emotional one.' " *Weinstein's Evidence*, ¶ 403[03] (quoting the Advisory Committee's Note to Rule 403). Nor is it likely to arouse the jury's sense of horror, provoke its instinct to punish, or lead the jury to base its decision on something other than the established facts in the case. *Id.* at ¶ 403[03]. The trial judge clearly did not abuse his discretion in admitting this evidence.

### C.

In evaluating Levy's and Gozlon–Peretz's argument that all the above facts, considered together, do not show that they had the requisite knowledge and intent to convict them of the crimes charged, we must decide "whether, viewing the evidence most favorably to the government, there is substantial evidence to support the verdict." *Wexler*, 838 F.2d at 90. We find that the record contains the requisite support.

■ In Levy's case, she used a false name both to rent the hotel rooms, which were used as 'command posts,' and to mislead the police after she was arrested. She traveled to Atlantic City with Gozlon–Per-

---

**2.** Yehuda used several false names during his dealings with Maloney. At the times Yehuda called Maloney he usually identified himself as "George," when he checked into hotels in New Jersey he told Maloney to ask for "Mr. Sabag," and when he arrived in New Jersey in February of 1987 he used the name of Berthold Holly to rent room 1430 at the Sands Hotel.

etz and Yehuda, Gozlon–Peretz stayed with her in both rooms, Yehuda called the rooms she had rented during the course of the negotiations, and Gozlon–Peretz used those rooms to return Yehuda's calls. Moreover, it might also be inferred that the drugs were kept in the room she had rented at the Sands Hotel for most of the negotiating period on February 26, 1987.[3] And most importantly, Levy received a phone call from Yehuda, proposed a compromise to keep the transaction alive, and passed the proposed compromise on to Gozlon–Peretz.

This evidence supports the jury's conclusion that Levy not only had knowledge of the conspiracy but also played a significant role in bringing it to fruition.

■ The evidence supporting Gozlon–Peretz's conviction is stronger than that supporting Levy's. Not only did he travel to Atlantic City with Levy and Yehuda, aid in engaging room 1002, occupy the "command posts" with Levy and give a false name to the police, but the jury was also entitled to infer from Yehuda's many co-conspirator statements that Gozlon–Peretz was the supplier of heroin who used Yehuda to dictate the terms of the sale.

### D.

■ We now turn to the question of whether error was committed in the sentencing of Gozlon–Peretz and Yehuda. Gozlon–Peretz was sentenced on Count Three to twenty years in prison, a Special Parole Term of five years, a "stand committed" fine of $200,000 and a $50 Special Assessment. The court also imposed concurrent twenty year terms on Counts One

and Two, a Special Parole Term under Count Two, and additional Special Assessments.

On Count Three, Yehuda was sentenced to twenty years in jail, a Special Parole Term of five years, a "stand committed" fine of $200,000, and a Special Assessment of $50.

After sentence was imposed, the Assistant U.S. Attorney sought to clarify the import of Gozlon–Peretz's sentence under the new drug sentencing laws and engaged in the following exchange with the sentencing judge:

> Is it my understanding that Count 3, being the more severe count, that the defendant is also sentenced to a mandatory minimum term of ten years in prison, which he must serve without probation or parole; and that on Count 2 that there is a minimum of five years, which he must serve without probation or parole; is that correct, Judge?

Appendix at 291. To which the judge replied, "[t]hat's correct. That's correct." *Id.*

■ The prosecutor's statement of the parole consequences of the sentence imposed was not correct. The relevant sentencing provisions, as revised in October 1986,[4] state that "[n]o person sentenced under this paragraph shall be eligible for parole during the term of imprisonment imposed therein." 21 U.S.C. § 841(b)(1)(A)(i), (b)(1)(B)(i). Thus, with respect to at least two of his twenty year sentences,[5] Gozlon–Peretz is not entitled to be considered for parole at any time.

---

**3.** The drugs had to be somewhere when Yehuda met with Agent Maloney at 7:05 pm. The most probable place would be in the room that his likely suppliers had rented, especially given the permissible inference that he went to room 1002 after telling Maloney that he was going to leave the scale with "his friend" so that the friend could measure out the drugs before delivery. Yehuda only rented room 1430, where the rest of the drugs were found, at 10:55 pm.

**4.** The provisions of the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, §§ 1002 & 1003, amending the relevant aspects of 21 U.S.C. § 841(b)(1) became effective immediately upon the signature of the President on October 27, 1986. *U.S.*

*v. Meyers,* 847 F.2d 1408 (9th Cir.1988); U.S. Dept. of Justice, *Handbook on the Anti–Drug Abuse Act of 1986,* at ix (Crim.Div.1987).

**5.** It is doubtful whether Gozlon–Peretz's twenty year sentence on Count One, which alleges a conspiracy to distribute heroin in violation of 21 U.S.C. § 846, implicates the provisions of the Anti–Drug Abuse Act of 1986 prohibiting parole. See, *Handbook on the Anti–Drug Abuse Act of 1986,* at 17–20; *United States v. Jureidini,* 846 F.2d 964 (4th Cir.1988). We need not decide this issue, however, because where the sentences imposed on two of three counts are vacated and all three sentences arise from the same criminal transaction, it is appropriate to

Based upon the exchange between the prosecutor and the court, there is an unacceptable risk that at least two of Gozlon-Peretz's current sentences are the result of a misconception concerning their legal effect. Accordingly, under *United States v. Katzin,* 824 F.2d 234, 240 (3d Cir.1987) ("sentencing on the basis of materially untrue assumptions violates due process") (citing *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972)); *United States v. Kerley,* 838 F.2d 932, 941 (7th Cir.1988) (remand for resentencing required when sentence may have been based on legal and factual misunderstandings), Gozlon–Peretz is entitled to have his sentences on Counts Two and Three vacated.[6] We will vacate Gozlon–Peretz's sentences and will remand for resentencing.

Yehuda's sentence, imposed on the same day as Gozlon–Peretz's, was similarly flawed.[7] We will also vacate Yehuda's sentence and remand for resentencing.

In addition, Yehuda also challenges the "stand committed" fine of $200,000 imposed on him by the district court judge in the absence of any factual findings regarding his ability to pay that fine. The judge ordered that the "defendant ... stand committed until the fine is paid or he is otherwise discharged by due process of law." We confess to some uncertainty as to what the judge intended by this language. Given that the judge apparently believed Yehuda was destined to spend a minimum of ten years in prison without regard to whether the fine was paid, the reference to a discharge by due process of law may reflect an anticipation on his part that Yehuda could raise any "ability to pay" issue in a subsequent proceeding if a failure to pay the fine ever became the sole reason for his incarceration.

■ Because of our disposition of the other sentencing issue, we find it unnecessary to decide whether the district judge's failure to make a finding regarding Yehuda's ability to pay was reversible error in this context. When the district court holds a resentencing hearing for Yehuda following remand, it will have before it a defendant who was determined at the commencement of this appeal to be unable to pay court costs. With indigency having been so established, we think it likely that the district court either will decline to impose a "stand committed" fine or will accompany

---

vacate the third, valid sentence, *see, United States v. Rosen,* 764 F.2d 763 (11th Cir.1985), *cert. denied,* 474 U.S. 1061, 106 S.Ct. 806, 88 L.Ed.2d 781 (1986), in order to afford the trial judge an opportunity to properly exercise his sentencing discretion, *United States v. Grayson,* 795 F.2d 278, 287 (3d Cir.1986), *cert. denied,* 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 505 (1987) and to "reduce the possibility of disparate and irrational sentencing." *United States v. Busic,* 639 F.2d 940, 948 (3d Cir.), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981); *cf. United States v. Hawthorne,* 806 F.2d 493, 499–501 & n. 14 (3d Cir.1986).

**6.** In view of our decision on this issue we need not reach appellant Gozlon–Peretz's claim of ineffective assistance of counsel during the sentencing phase.

**7.** The following colloquy occurred with respect to Yehuda:

THE COURT: ... It is adjudged on Count 3 that the defendant is hereby committed to the custody of the Attorney General of the United States or his authorized representative for a *term of 20 years* plus five years special parole,

and is fined two hundred thousand dollars. The defendant is ordered to stand committed until the fine is paid or he is otherwise discharged by due process of law. Special assessment of 50 dollars is imposed.
. . . .
Asst. U.S. Atty.: Yes Judge. But first one additional inquiry. Am I given to understand that the court also has imposed a *ten year mandatory minimum,* which the statute requires in this instance?
THE COURT: I have on my presentence investigation report the penalty as five years special parole.
Asst. U.S. Atty.: Judge, with the amount that he pleded [sic] guilty to it was—*no, I'm talking about the mandatory minimum of the incarceration.* There is a five years [sic] mandatory special parole, but the offense to which the defendant pleaded guilty carries a ten year mandatory minimum.
THE COURT: The ten year mandatory minimum takes care of that.
Asst. U.S. Atty.: Does it?
THE COURT: Correct, its a statutory minimum. [sic]
Appendix to Yehuda's Brief at 46–47 (emphasis added).

the imposition of such a fine with an explanation of its purpose. Clearly, that would be the preferable practice in these circumstances.[8]

## IV.

Since the evidence challenged by Levy and Gozlon–Peretz was properly admitted and as there was sufficient evidence to support their convictions for the crimes charged, we will affirm their convictions. We will vacate Yehuda's and Gozlon–Peretz's sentences and remand for resentencing.[9] Levy's sentence will be affirmed.

---

**8.** There is general agreement that a district court has authority to impose a "committed fine," that is a fine which will result in incarceration until payment is made. *See, e.g., Hill v. U.S. ex rel. Wampler,* 298 U.S. 460, 56 S.Ct. 760, 80 L.Ed. 1283 (1936). The purpose of such a fine, however, is to assist enforcement of the order imposing it, *e.g., Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970), a purpose that is not served by the imposition of a "committed fine" on an indigent defendant. The Court of Appeals for the Ninth Circuit, however, has held that, though an indigent defendant may not ordinarily be incarcerated for non-payment of a fine, this principle does not impair the validity of a judgment containing a committed fine if there is reason to believe that the defendant's ability to pay will be determined before the defendant is held solely on the basis of the non-payment of the fine. *United States v. Estrada de Castillo,* 549 F.2d 583 (9th Cir.1976); *United States v. Miller,* 588 F.2d 1256 (9th Cir. 1978). The argument in favor of this position sanctioning reliance on a subsequent determination of the defendant's ability to pay becomes

stronger where, as here, there is a lengthy term of imprisonment in addition to the fine. Nevertheless, the likelihood of a material increase in assets during incarceration normally will not be substantial and, if there is any reason at the time of sentencing to question whether the defendant is financially responsible, we think it at least prudent for the sentencing judge to address the ability-to-pay issue before imposing a committed fine. If the court's decision is in favor of imposing such a fine, its supporting findings will be of assistance in the event the fine ultimately becomes the only basis for detaining the defendant. If the court decides against a committed fine because of the defendant's financial position or for any other reason, the possibility of a commitment to incarceration remains open, of course, if it can later be shown that the defendant has failed to pay despite an ability to do so. *See Tate v. Short,* 401 U.S. 395, 400, 91 S.Ct. 668, 671, 28 L.Ed.2d 130 (1971).

**9.** Given our decision to remand for resentencing, we need not reach Yehuda's Eighth Amendment argument.