

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-26-2004

# USA v. Trala

Precedential or Non-Precedential: Precedential

Docket No. 02-4524

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Trala" (2004). *2004 Decisions.* Paper 164.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/164

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No: 02-4524

UNITED STATES OF AMERICA

v.

JOHN WALTER TRALA
a/k/a Sonny
a/k/a Walter John Trala

JOHN WALTER TRALA,

Appellant

Appeal from the United States District
Court
for the District of Delaware
(Crim. No. 00-cr-00023-1)
District Court: Hon. Gregory M. Sleet

Argued: December 15, 2003

Before: ROTH and McKEE, Circuit
Judges,
and ROSENN, Senior Circuit Judge.

(Filed October 26, 2004)

OPINION

Penny Marshall, Esq. (Argued)

Office of the Federal Public Defender

704 King Street

First Federal Plaza, Suite 110

Wilmington, DE 19801

Attorney for Appellant

Keith M. Rosen, Esq. (Argued)

Office of United States Attorney

1007 Orange Street, Suite 700

Wilmington, DE 19899

Attorney for the Appellee

McKEE, Circuit Judge.

John Walter Trala appeals his conviction for bank robbery, conspiracy to commit bank robbery, and use of a firearm during a crime of violence. For the reasons below, we will affirm.

**I**

**A. Background of the Robbery**

Trala's conviction stems from his participation in the armed robbery of the PNC bank branch in the Eden Square Shopping Center in Bear, Delaware (the "Bank"). However, events began in the spring of 1999 when the Bank's head teller, Melissa Bailey, began stealing money from the Bank's vault to support her husband's drug habit. App. 1248-51. By November 1999, Mrs. Bailey had stolen approximately $100,000. App. 1250.

Around that time, the Bank

1

received $400,000 in cash from the Federal Reserve to cover an increase in customer withdraws that was anticipated as a result of the "Y2K" computer scare. App. 1251-52, 1254. Mrs. Bailey, as head teller, had sole responsibility for these funds, which were kept in a separate safe inside the Bank's vault. App. 1252. The influx of Y2K funds afforded Bailey an opportunity to replace the $100,000 she had stolen from the Bank. However, Bailey knew that any shortfall in the Y2K funds would eventually be discovered because those funds had to be returned to the Federal Reserve on January 19, 2000. App. 1255-56.

Mrs. Bailey's husband, Philip Bailey, operated a concrete business where Trala worked as a concrete finisher. App. 1119. In the fall of 1999, Mrs. Bailey and Trala began discussing the possibility of robbing the Bank to create an explanation for the missing Y2K funds. The robbery would account for any shortfall in the Y2K funds, thereby preventing the detection of Mrs. Bailey's prior embezzlement when those funds were returned to the Federal Reserve. App. 1136-37, 1258-59. Mrs. Bailey informed Trala about the "Y2K" funds, told him where the money was located, and informed him that she would have to be present during the robbery they were planning because she was the only person with the second half of the combination to the vault. App. 1259-60.[1]

### B. The Robbery

The bank was robbed at approximately 8:00 AM on January 14, 2000. App. 1031-33. As planned, Mrs. Bailey was present, as was Bank manager, Brian Warnock. *Id.* Another Bank teller, Lillian Foley, arrived while the robbery was in progress. App. 1053. After the robber fled, Foley drove to a nearby store and asked someone to call the police. App. 1056-57. When Delaware police arrived, an officer found a red sweatshirt and black knit cap on a sidewalk near the Bank. Those garments matched the Bank employees' descriptions of the garments worn by the robber. App. 1073.[2] Warnock and Foley described the robber as 5'6"-5'9," 150-160 pounds,[3] and wearing a red hooded sweatshirt. App. 1033, 1054. Warnock also indicated that the perpetrator was wearing a dark stocking cap and sunglasses. *See* App. 1033. When questioned, Mrs. Bailey denied any involvement in the robbery and indicated that $400,000 had been stolen from the vault. App. 1274-75.

Mr. Bailey was sick at home on the morning of the robbery. App. 1143. He testified at Trala's trial that Trala came into Mr. Bailey's room the morning of the robbery, pulled money out of a brown

---

[1] Any other Bank employee would have the first half of the combination. App. 1259.

[2] Trala admitted at trial that the red sweatshirt was his, and that he owned a number of black knit caps like the one found near the scene of the robbery. App. 1762.

[3] During a routine processing interview, Trala stated that he was approximately 5'8" and 155 pounds. App. 1564.

2

paper bag, and asked Bailey how much he wanted. App. 1144-45. Bailey further testified that Trala told him that he would put the money in Mr. Bailey's shop. *Id.*[4] Later that day, Trala returned home to Elkton, Maryland and paid his landlord for two weeks' rent. He paid in $100 bills, which the landlord testified was unusual. App. 1104-05. Trala then left Maryland and drove to North Carolina with his girlfriend, Vicky Prince, and her daughter. App. 1776-77.

On February 10, 2000, Mrs. Bailey was interviewed by an FBI agent and confessed her involvement in the Bank robbery, as well as the 1999 thefts. App. 1360-61.

### C. Trala's Arrest in North Carolina

On the morning of February 10, 2000, Moorehead City, North Carolina Patrol Officer, Timothy Guthrie, stopped a 1990 Ford Taurus. Trala was driving and Prince was a passenger. App. 1440, 1464-70. When Trala could not produce a

driver's license, Officer Guthrie asked him for his name and date of birth. Trala replied that his name was "Natt Albert Allen, Jr." App. 1441. Prince also told Officer Guthrie that Trala's name was "Natt Allen, Jr." App. 1449. In speaking with the Officer, Trala stated that he had over $10,000 in cash in the car, and said it was proceeds from a recent property deal. App. 1444.

When Sergeant Felicia Long arrived on the scene, she spoke to Trala at the "rear of the vehicle" and he repeated what he had just told Officer Guthrie. App. 1963-64. Sgt. Long then spoke to Prince "at the front of the vehicle." Prince initially identified herself as "Michele Trala," but later said that her name was actually Vicky Prince. App. 1465, 1470. When asked about the cash, Prince initially stated that the money came from "working and saving." App. 1468. When asked the same question later in the conversation, she stated that Trala "won it at the races in Delaware." App. 1970. However, Prince changed her story after police told her that there would be a record of any winnings at the race track. Prince then said that Trala "won the money at the slots." App. 1471.

Prince and Trala were placed under arrest and police eventually searched the car where they found $35,123 in cash. App. 1487-89. Trala was subsequently turned over to federal authorities in Delaware and charged with: (1) bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d), and 2 (Count I); (2) conspiracy to commit bank robbery in violation of 18 U.S.C. § 371 (Count II);

---

[4] Trala had a different version of the events that took place on the day of the robbery. He testified that he showed up for work that morning, but found the shop empty. App. 1766. While he was cleaning towels, Mr. Bailey arrived and went into the office area of the shop. App. 1766-67. When Trala finished his work, he went into the office and noticed that Mr. Bailey had a large amount of cash. App. 1767. When he questioned Mr. Bailey about the money, Mr. Bailey gave him approximately $30,000 dollars and told him to stay quiet about what he had seen. *Id.*

and (3) use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Count III). App. 36-38.[5]

### D. DNA and Trace Evidence

The sweatshirt and knit cap that police found just outside the Bank were sent to the FBI laboratory in Washington, D.C. App. 1498-99. FBI agents also collected hair and saliva samples from Trala and took carpet samples from his motel home. App. 1492-93, 1504-05. These samples were sent to the FBI laboratory for comparison with the samples from the sweatshirt and knit cap. App. 1493-94, 1506.

Forensic examination determined that the hairs taken from the garments exhibited the same microscopic characteristics as the hairs taken from Trala and the fibers taken from his carpet. App. 1591-92. The FBI laboratory also compared DNA taken from hairs on the knit cap found near the Bank following the robbery with DNA taken from Trala's saliva sample. The forensic examiner used a method of DNA typing known as "PCR/STR" typing. App. 1630, 1633. The results revealed that the sample taken from the knit cap was mixed, *i.e.*, it contained DNA from more than one person. App. 1639-40. The examiner determined, however, that there was a clear majority contributor to the sample, and that the DNA of the major contributor

matched Trala's DNA to a reasonable degree of scientific certainty. App. 1640.

Prior to trial, Trala filed a motion *in limine* challenging the admissibility of the DNA evidence. He argued that the evidence should be excluded because PCR/STR typing, as applied to mixed DNA samples, did not satisfy the standard for scientific reliability under Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). After conducting a three-day evidentiary hearing, the district court issued a well reasoned and comprehensive opinion explaining its conclusion that the expert testimony was admissible.

### E. Jury Deliberations

The trial began on Monday, November 26, 2001. App. 899. By Friday, November 30, both sides had rested, and the jury began deliberations at approximately 1:00 PM. App. 1919. The first day of deliberations ended at 4:30 PM due to a juror's previously scheduled weekend trip. App. 1919, 1931-3. The following Monday, December 3, deliberations did not begin until approximately 1:00 PM because the same juror was late returning from her trip. App. 1966. Shortly after 5:00 PM on the second day of deliberations, the court asked the deputy clerk to find out if the jurors wanted to order dinner and continue their deliberations. App. 1965. The jury responded with the following question: "The jury wants to know if they can't come to [a] unanimous decision, and this is before they decide about dinner, is it

---

[5] In addition to these three counts, Mrs. Bailey was charged with embezzlement in violation of 18 U.S.C. § 656. App. 38.

4

over or will they have to come back?" *Id.*

The following exchange then took place between the court and defense counsel:

THE COURT:[M]y inclination at this time at 5:05 is to advise the jury that we're prepared to order dinner.

. . .

[DEFENSE COUNSEL]: Your Honor, the difficulty is that [this] is some expression of . . . possibly not being able to reach a verdict.

THE COURT:The jury hasn't deliberated long enough to even be close to that point. They didn't commence their deliberations until 1:00 o'clock today. They didn't start their deliberations until 1:00 o'clock on the day that they got the case . . . .

[DEFENSE COUNSEL]:Here is my problem, your Honor. If they asked the question and we give no response to it one way or the other, then we put them in a position.

THE COURT:Of ordering dinner and continuing their deliberations.

[DEFENSE COUNSEL]:But we're

not answering their question.

THE COURT:I feel like we're answering their question. If they have a further question to the Court's response, we'll respond at that time.

App. 1966-67. When informed of the court's response, the jurors decided to order dinner. At approximately 8:00 PM, they returned with a verdict finding Trala guilty on all charges.[6] App. 1967, 1969-72.

This appeal followed.

## II

### A. Expert Testimony Relating to PCR/STR DNA Typing

Trala's primary argument is that the district court erred by admitting DNA evidence linking him to the knit cap found near the scene of the robbery. He argues that PCR/STR DNA typing does not meet the standard for scientific reliability under Federal Rule of Evidence 702 and *Daubert* when applied to mixed DNA samples. "We review the decision to admit or reject expert testimony under an abuse of discretion standard." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396,

---

[6] Trala was eventually sentenced to a total of 322 months imprisonment, five years of supervised release, a $300 special assessment, and restitution in the amount of $144,457. App. 1974-80.

404 (3d Cir. 2003).[7]

After careful examination of the record, we conclude that there was no abuse of discretion. We hold that the PCR/STR DNA typing utilized in this case does in fact meet the standards for reliability and admissibility set forth in Federal Rule of Evidence 702 and *Daubert*. In *Daubert*, the U.S. Supreme Court interpreted and applied Rule 702, which replaced the common law rule requiring "general acceptance" for the admissibility of scientific evidence with a standard requiring an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. at 586, 592-3. The Court held that "the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. In light of this, we note that the district court's painstaking opinion provides a thorough and compelling analysis of the court's rejection of Trala's challenges to the DNA evidence. We conclude that the court did not abuse its discretion in admitting the DNA evidence substantially for the reasons Judge Sleet sets forth in his opinion. *See* 162 F. Supp. 2d 336 (D. Del. 2001).

**B. The Jury's Question about Continuing Deliberations**

Trala also argues that the district court coerced the jury into reaching a verdict by giving them a "non-responsive directive to order dinner" in response to their inquiry about whether they would have to continue deliberations the following day if they were deadlocked. Br. at 35 (internal quotation marks omitted). He argues that "[a] reasonable impression was given to the jurors that they needed to stay until they reached a verdict, no matter how long that took." *Id.*

Although a district court may not coerce a jury into reaching a unanimous verdict, it is well-established that it has broad discretion to determine how long jury deliberations should continue. *See*, *e.g.*, *Govt. of V.I. v. Gereau*, 502 F.2d 914, 935-36 (3d Cir. 1974). Thus, "[a]bsent peculiar evidence indicative of coercion, it is proper for a judge to instruct a deadlocked jury to continue deliberations and attempt to arrive at a verdict." *Id.*; *see*

---

[7] Trala suggests that we should apply the plenary standard of review to the district court's "interpretation of Rule 702's application to DNA evidence." Br. at 64. However, the court did not *interpret* Rule 702; it merely applied the rule in accordance with Supreme Court and Third Circuit precedent. *Compare Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (exercising plenary review of the district court's decision not to conduct a *Daubert* hearing, but noting that we "ordinarily review a district court's application of Rule 702, as well as the decision whether to grant a *Daubert* hearing, for abuse of discretion . . . ").

6

*also United States v. Grosso*, 358 F.2d 154, 159 (3d Cir. 1966), *overruled on other grounds*, 390 U.S. 62 (1968). In *Gereau*, we affirmed a guilty verdict where the jurors were instructed to continue deliberations for at least one more afternoon after they had already deliberated for nearly 40 hours. Despite the length of the deliberations, we found that there "was no threat that the jury would be locked up indefinitely unless a verdict was reached . . . ." *Id.* at 936; *compare Jenkins v. U. S.*, 380 U.S. 445, 446 (1965) (per curiam) (finding coercion where, after two hours of deliberations, the court told a deadlocked jury: "You have got to reach a decision in this case.") (internal quotation marks omitted).

Our decision in *Gereau* was based in part on the fact that the court there advised the jury that it did not have to reach a unanimous verdict. *Id.* However, such an instruction is not required unless there is some evidence of coercion. *United States v. Price*, 13 F.3d 711, 725 (3d Cir. 1994) ("The mere absence of . . . an instruction [that the jury can return a hung verdict] does not in and of itself suggest coercion."). Nor does the court have to set a particular time limit on deliberations, even after the jury has expressed that it is hopelessly deadlocked. In *Grosso*, for instance, we affirmed a guilty verdict where the court simply instructed a deadlocked jury to "keep on working." 358 F.2d at 159 (internal quotation marks omitted). We held that "[t]he length of time a jury may be kept together for the purpose of deliberation is

a matter within the discretion of the trial judge, and his action in requiring further deliberation after the jury has reported a disagreement does not, without more, constitute coercion." *Id.* at 160; *compare U.S. v. Fioravanti*, 412 F.2d 407 (3d Cir. 1969) (holding that the *Allen* charge, where the court instructs jurors in the minority to question their own judgment in light of the contrary view held by the majority, was coercive).

Here, the court did not require the jurors to stay and order dinner as Trala suggests. Rather, the judge gave jurors the *option* of ordering dinner and continuing their deliberations into the evening. App. 1965 ("I've asked our courtroom deputy to find out if the jury wants to order dinner. They're discussing it."). The jury then responded with the following question: "[I]f they can't come to [a] unanimous decision, and this is before they decide about dinner, is it over or will they have to come back?" App. 1965. After a brief discussion with defense counsel, the court simply reiterated that it was "prepared to order dinner." App. 1966. At that point, the jury, which had only deliberated for four hours that day (and a total of seven and a half hours), chose to order dinner and continue deliberations. App. 1966-67. Three hours later, they reached a verdict. This does not suggest a "threat that the jury would be locked up indefinitely unless a verdict was reached, nor was there any indication that jurors should doubt the judgments they had arrived at independently." *Gereau,* 502 F.2d at 936. The court merely implied that it was not

convinced of a deadlocked jury after only seven and a half hours of deliberations. This was a proper exercise of the court's discretion.

### C. Prince's Statements to Sgt. Long

Finally, Trala argues that the court erred in admitting Prince's conflicting statements to Sgt. Long regarding her identity, and the source of money in his car. He challenges Long's testimony that Prince said: (1) that her name was "Michele Trala"; (2) that her name was actually Vicky Prince; (3) that the money in the car was from working and saving; (4) that Trala won the money at the racetrack; and (5) that he won the money playing slot machines. *See* App. 1465-71. Trala argues that the admission of these statements violated the Confrontation Clause of the Sixth Amendment and Federal Rule of Evidence 402. We will address each of these arguments in turn.

### 1. The Confrontation Clause

Trala concedes that Prince's statements were not hearsay because they were not offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Rather, the statements were offered in an attempt to establish Trala's consciousness of guilt. App. 1466. Yet this does not end our inquiry under the Confrontation Clause of the Sixth Amendment. As the Supreme Court noted recently in *Crawford v. Washington*,

124 S.Ct. 1354 (2004):

> Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices. . . . Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." 124 S.Ct. at 1364, 1370.

We exercise plenary review over Confrontation Clause challenges. *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998).[8]

The right of cross-examination is secured by the Confrontation Clause. *Crawford v. Washington,* 124 S.Ct. at 1357; *see also Douglas v. Alabama*, 380 U.S. 415, 418 (1965). In *Crawford*, the Court held that witnesses' out-of-court

---

[8] The government argues that Trala did not preserve his Confrontation Clause claim at trial. We disagree. At trial, defense counsel specifically objected to Sgt. Long's testimony regarding Prince's statements during the traffic stop on grounds that it violated the Confrontation Clause. App. 1466-67.

8

statements that are testimonial are barred by the Confrontation Clause, regardless of determinations of reliability, unless the witnesses are unavailable and the defendant has had a prior opportunity for cross-examination. Though *Crawford* bears generally on the present case because the evidence in question is testimonial ("[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard"), its principles are not contravened because the reliability of Prince's out of court statements is not at issue here. *Crawford v. Washington,* 124 S.Ct. at 1364. *Crawford* restates the constitutional requirement of cross-examination, or confrontation, as the primary — and indeed, the necessary—means of establishing the reliability of testimonial evidence. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374.

*Crawford* does not apply where the *reliability* of testimonial evidence is not at issue, and a defendant's right of confrontation may be satisfied even though the declarant does not testify. For example, in *Tennessee v. Street*, 471 U.S. 409, 411-12 (1985), the confession of a co-conspirator was read into the record during defendant's murder trial. It was introduced through the sheriff who had obtained it and it was admitted solely to rebut the defendant's testimony. *Id.* Significantly, the jury was specifically instructed not to consider the truthfulness

of the statement. *Id.* After he was convicted, the defendant challenged the admission of the confession on grounds that it violated the Confrontation Clause. The Supreme Court held that "[t]he Clause's fundamental role in protecting the right of cross-examination . . . was satisfied by [the Sheriff's] presence on the stand." *Id.* at 414. It further noted that "[i]f [the defendant's] counsel doubted that [the] confession was accurately recounted, he was free to cross-examine the Sheriff . . . ." *Id.* The Court acknowledged the possibility that the jury might improperly consider the truthfulness of the confession, as in *Bruton v. United States*, 391 U.S. 123 (1968), despite the district court's instruction to the contrary. *Id.*[9] Nevertheless, despite its *Bruton* concerns, the Court found that the probative value of the confession outweighed the possibility of misuse, and that "there were no alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper

---

[9] In *Bruton*, the Court reversed the defendant's conviction based on the admission of a co-defendant's confession, despite the fact that the court instructed the jury "that although [the co-defendant's] confession was competent evidence against [him] it was inadmissible hearsay against [defendant] and therefore had to be disregarded in determining [defendant's] guilt or innocence. 391 U.S. at 125.

use of evidence." *Id.* at 414-416.[10]

Although the court here did not expressly caution the jury against considering the truthfulness of Prince's statements, it is clear that no such warning was required because, unlike the situation in *Street*, there was absolutely no risk that the jury would mistakenly assume the truth of Prince's statements. In fact, the statements were admitted because they were so obviously false. They established that Prince was lying to the police about her identity, as well as the source of the money in Trala's car. Moreover, Trala's testimony was not to the contrary. Even he testified that Prince's name was not "Michele Trala," and that the money did not come from savings, the racetrack, or playing slot machines. *See* App. 1767, 1771. Furthermore, Sgt. Long was available for cross-examination, so defense counsel therefore had an opportunity to question her account of the conversation with Prince. Under these circumstances, we find that Trala's rights under the Confrontation Clause were satisfied.

### 2. Federal Rule of Evidence 402

Trala also challenges the relevancy of Prince's statements under Federal Rule of Evidence 402 ("Evidence which is not relevant is not admissible."); *see also* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). The district court found that Prince's statements were relevant to show Trala's consciousness of guilt under *United States v. Palma-Ruedas*, 121 F.3d 841 (3d Cir. 1997), *overruled on other grounds*, *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999). App. 1466. Our review of the court's interpretation of Rule 402 is plenary. *Mitchell*, 145 F.3d at 576.[11]

In *Palma-Ruedas*, a detective came to the house where the defendant was located and a woman named Alvarez answered the door along with defendant, whose actual name was Omar Torres-Montalvo. *Id.* at 856. At trial, the detective testified that Alvarez told him that Montalvo's name was "Carlos Torres." We held that the statement was not being introduced to prove the truth of the matter asserted, but rather to "show consciousness of guilt . . . ." *Id.* We

---

[10] In *United States v. Inadi*, 475 U.S. 387, 394 n.5 (1986), the Supreme Court cites *Green* for the proposition that there is not a complete overlap between hearsay rules and the Confrontation Clause.

[11] The government also argues that Trala did not properly preserve his relevance objection at trial. However, defense counsel raised a relevance objection when the government attempted to elicit similar testimony from Officer Guthrie, but was overruled by the court. App. 1445-1448. In a subsequent sidebar conference to discuss defense counsel's objections to Sgt. Long's testimony regarding Prince's statements during the stop, the court stated that it was "not going to allow [defense counsel] to reargue . . . the same objection." App. 1466. Therefore, the issue of relevance was properly preserved at trial.

explained:

> Even though Montalvo did not offer the information himself, he allowed Alvarez to offer the false statement without correcting her. The statement was thus probative regarding consciousness of guilt because the jury could have reasonably inferred that Montalvo welcomed Alvarez's misidentification of him.

*Id.* Here, however, Sgt. Long testified that she questioned Prince at "the front of the vehicle" after she questioned Trala near "the rear of the vehicle." (App. 1463, 1465). Trala and Prince were therefore separated by at least a car-length when she made the comments. In *Palma-Ruedas*, Montalvo was standing next to the declarant when she falsely identified him. Without more than was developed on this record about the respective positions of Trala and Prince when Prince made the challenged statements, the jury could only speculate as to whether Trala heard Prince so that he could have corrected Prince's misstatements. Absent such additional evidence tying Trala to Prince's statements, her statement regarding Trala's identity was not relevant to show Trala's consciousness of guilt. Because the evidence was not relevant for any other purpose, we find that it was improperly admitted.[12] However, as we explain below, we also conclude that the error was harmless.

There was an overwhelming amount of objective evidence linking Trala to the robbery, including: (1) the similarity between his build and the description of the robber; (2) his admission that he owned the sweatshirt found near the scene of the robbery; (3) his admission that he also owned a number of black knit caps like the one found near the scene of the robbery; (4) the DNA evidence linking him to the garments found near the scene of the crime; (5) Mrs. Bailey's testimony regarding her discussions with Trala about robbing the bank and the location of the Y2K funds; (6) her testimony that she recognized Trala during the course of the robbery, including the red sweatshirt that he wore; (7) Mr. Bailey's testimony that he saw Trala on the morning of the robbery with a brown paper bag full of money;[13] and (8) the unexplained cash in Trala's car. In addition, Trala himself lied to police about his name and the source of the money in his car, and those statements were clearly relevant and admissible. *See*

---

[12] Because we find that the admission of Prince's statements constituted legal error, we need not consider Trala's additional challenge under Federal Rule of Evidence 403.

[13] This is consistent with eyewitnesses who said the robber put the stolen money in a paper bag, and who saw the robber leave the bank carrying a brown paper bag. App. 1036, 1054, 1272.

11

*United States v. Levy*, 865 F.2d 551, 558 (3d. Cir. 1989) (en banc) ("[D]efendants' attempt to conceal their true identities by providing aliases to the police upon arrest is relevant as consciousness of guilt."). Thus, Prince's statements about his name and the source of the funds added little if anything to the evidence against him.

It is also significant that Prince and Trala both independently told Officer Guthrie that Trala's name was "Nate Allen, Jr." App. 1449. Although it is also unclear from the record whether Prince was near Trala when she made this statement, this is still relevant to show consciousness of guilt. The jury could reasonably infer that Trala and Prince agreed to lie about Trala's true identity, and that they did so to help him avoid apprehension. This is much stronger evidence of consciousness of guilt than in *Levy*, where we held that "the use of false identities by all three conspirators . . . tended to show joint planning and coordination by the defendants in an attempt to protect themselves from future investigation and pursuit." 865 F.2d at 558. Under the facts of *Levy*, it was possible that the use of false names by all three defendants was merely coincidence. Here, there is no question that the parties agreed beforehand that they would refer to Trala as "Natt Allen, Jr." Thus, even though Prince's statements to Sgt. Long were inadmissible, the jury heard similar, admissible evidence of Trala's consciousness of guilt. There is therefore no merit to Tala's claim that this error requires a new trial.[14]

### III

For the reasons set forth herein, we will affirm Trala's judgment of conviction and sentence.[15]

---

[14] In fact, given the additional evidence of Trala's guilt, the prosecutor's insistence on admitting what Prince said at the rear of the car was nothing more than "gilding the lily."

[15] After this matter was submitted, Trala filed a Motion for Leave to File Supplemental Briefing in Light of *Blakely v. Washington*, 124 S.Ct. 2531 (2004). In it he first argues that the Career Offender Enhancement that he received "requires a district court's findings as to both the nature of the instant offense and prior convictions, i.e., whether such convictions qualify as crimes of violence." *See* U.S.S.G. § 4B1.1 ("A defendant is a career offender if [*inter alia*] the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense [and] the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."). However, whether an offense is a "crime of violence or a controlled substance offense" is a legal determination, which does not raise an issue of fact under *Blakely* or *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

Trala also challenges the district court's order of restitution. 18 U.S.C. § 3664(e), provides: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." However, *Blakely* and *Apprendi* apply only where there is a resolution of disputed issues of fact that results in a sentencing enhancement beyond the statutory maximum. *See Blakely*, 124 S.Ct. at 2537

("Our precedents make clear, however, that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" (citations omitted). Here, there was no contested evidence about the amount of money that was taken. Therefore, the *amount* of restitution was not a disputed issue of fact under *Blakely.*